

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| George D. McCarley | | |
| Plaintiff | | Civil Action No. <u>3:06-CV-0091-MEF</u> |
| v. | | Lead Case[1] |
| | | |
| Household Finance Corporation III | | |
| Defendant | | Jury Trial Demand |

This amended RESPA brief is presented as a means of clarification of charges and pleadings; the original charges having been substantially dismissed by the court. The amended complaint contained has been cleansed of all charges not pertaining to the RESPA issues. Some briefs in support contain non-RESPA material in the manner of comparison.

APPENDIX AND CASE INDEX
AMENDED RESPA BRIEF

| | Page |
|---|---|
| Amended Complaint | |
| Proof of Service | 7 |
| Briefs in Support of Factual Allegations | 8 |
|     Overview of Material Facts | 8 |
|     Motive Intent and Opportunity | 11 |
|     Disclosure Definition per statute | ~~15~~ 16 |
|     Regulation Z brief in support | 23 |
|     Fraud Treatise | 26 |
|     Servicer and Disclosure Brief | 27 |
|     Disclosure Fraud at Inception of Mortgage | 30 |
|     Misapplication of Major Payments | 33 |
|     Monthly Disclosure and Escrow Violations | 35 |
|     Default Fraud and Related Disclosure Violations | 39 |
|     Qualified Written Request, Failure by Defendant(s) | 43 |
|     Identity Fraud, Disclosure Violations of Defendant(s) | 45 |
|     Fraud at Foreclosure by Homesense and Defendant(s) | 46 |
|     Addendum of Common Law Breach Citations Applicable | 49 |
|     Damages, Brief In Support | 53 |

---

[1] The defendant above is noted as the lead case of five remaining cases filed against the corporation known as HSBC. The five defendants are; Household Finance Corporation III (00093), and, HSBC Gr. Corp. (00102), Household International, Inc. (00103), and, HSBC Finance Corporation (00101), and, HSBC Mortgage Services, Inc. (00104); (HSBC). Complete location, official mailing addresses, contact person(s) and corporation registration agent at the Chicago Headquarters location found in Doc # 5, page 19. Parent Corporation (HSBC) is a Foreign Corporation registered and headquartered in Chicago, Illinois.

Plaintiff has included over 60 exhibits with Doc #19 that represent the material facts exhibits to be used at trial. We are in process of authentication of those exhibits for trial.

Regulation X and Z, (text included)
12 CFR §§226.5, 226.9, 226.17(text included)

Allen v. Beneficial Finance, D.C.Ind, 1975, 393 F.Supp.1382, affirmed 531 F.2d 797
            Page 16,17,18,22
Bizier v. Globe Financial Services, Inc., C.A.Mass 1981, 654 F.2d 1.
            Page 18
*Bramlett v. Adamson Ford*, [ No. 2950526, 1996 WL 730853 (Ala. Civ. App., Dec. 20, 1996)
            Page 21,22
Brown v. Coleman Co. Inc., 2000 10Cir 916, 220 F.#d. 1180 Case Number 99-3181, 99-3203
            Page 59
Conrad v. Beneficial Finance Co. of New York Inc., 1977, 394 NYS2d 923.
            Page 18, 48, 58
Cortez v. Keystone Bank, Inc., No. 98-2457, 2000 WL 536666 (E.D.Pa. May 2000)
            Page 58
Dalton v. Bob Neil Pontiac, D.C.N.C. 1979, 476 F.Supp. 789, affirmed 628 F.2d 1348
            Page 17
Ecenrode v. Household Finance Corp. of South Dover, D.C.Del.1976, 422 F.Supp. 1327
            Page 17
In re Tomasevic, Bkrtcy,M.D.Fla.2002, 273B.R. 682
            Page 59
Johnstone v. Bank of America, N.A., N.D.Ill.2001, 173 F.Supp2d 809
            Page 35, 55, 58, 59
Katz v. Dime Savings Bank, FSB, W.D.N.Y.1997, 992 F.Supp 250.
            Page 58
Kelly v. Beneficial Finance Co. of Alabama, Ala.CivApp. 1979, 374 So2d 338, writ denied 374
So2d 340      Page 18
Littlefield v. Walt Flanagan & Co., C.A. Colo 1974, 498 F.2d 1133.
            Page 18
Miller v. Weitzer Panache, Ltd., S.D.Fla.1990, 751 F.Supp 980
            Page 26, 57
Pedro v. Pacific Plan of California, D.C.Cal. 1975, F.Supp. 315.
            Page 24
Rawlings v. Dovenmuehle Mort., Inc., M.D.Ala.1999, 64 F.Supp.2d 1156
            Page 58
Renninger, 1998 WL 29547 at *6.   (Renninger v. Chex Systems)
            Page 40, 56, 59
*Smith v. First Family Financial Services* [ 626 So. 2d 1266 (Ala. 1993)
            Page 19
White v. Arlen Realty & Dev , C.A.Md 1975, 540 F.2d 645
            Page 17
Prof. Gene Marsh treatise: A Practitioners Guide to the New Alabama Mini-Code)
            Page 18

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

RECEIVED

2007 MAY -1  A 9: 34

| |
George D. McCarley | Civil Action No. <u>3:06-CV-0091-MEF</u>
Plaintiff | Lead Case[1]
v. |
|
Household Finance Corporation III |
Defendant | Jury Trial Demand

AMENDMENT OF COMPLAINT OF RESPA VIOLATIONS

1.    This is an action at law to redress the injuries inflicted on George D. McCarley by

defendants, and all of them, under color of law, and in full violation of 12 USC §2601 through

§2617 and related provisions of Regulation(s) X and Z, otherwise known as The Real Estate

Settlement Procedures Act (RESPA) by means of disclosure fraud and breach of contract and arising

under the laws of the United States of America.    Primary damages statute is found at 12 USC

§2605.

Defendant(s) named above, and each of them, is charged with violation of 12 USC §2601

through §2617 and related provisions of Regulation(s) X and Z, otherwise known as The Real Estate

Settlement Procedures Act (RESPA), by means of disclosure fraud and breach of contract.

Jurisdiction

2. Jurisdiction of this court relative to Default is found in 12 USC §2614.

---

[1] The defendant above is noted as the lead case of five remaining cases filed against the corporation
known as HSBC. The five defendants are; Household Finance Corporation III (00093), and, HSBC
Gr. Corp. (00102), Household International, Inc. (00103), and, HSBC Finance Corporation (00101),
and, HSBC Mortgage Services, Inc. (00104); (HSBC). Complete location, official mailing
addresses, contact person(s) and corporation registration agent at the Chicago Headquarters location
found in Doc # 5, page 19. Parent Corporation (HSBC) is a Foreign Corporation registered and
headquartered in Chicago, Illinois.

3. The matter in controversy exceeds, exclusive of interest and costs, the sum or value of ten thousand dollars, ($10,000), as per 28 USC §1331.

4. During all times mentioned, Plaintiff is a citizen of The United States and State of Alabama, with address found at close of this filing.

5. During all times mentioned, defendant(s) is a Foreign corporation headquartered in Chicago, Illinois, with operations in other sections of the United States.

6. At all times material to the complaint, defendant(s) acts were performed under color of law and what they believed to be statutes of the United States and State of Alabama.

7. During all times mentioned herein, the individual defendants, and each of them, separately and in concert, acted under color and pretense of laws of the United States and Alabama. Each of the individual defendant(s) here, plus other persons and/or corporations unknown to plaintiff, separately and in concert, engaged in the illegal conduct here mentioned to the injury of plaintiff and deprived plaintiff of the rights, privilege, immunities, and protections of the United States Constitution.

8. The defendant(s) and HSBC, together with persons and/or corporations unknown to plaintiff, acting under color of law, have subjected plaintiff to a pattern of conduct consisting of violation of portions of RESPA[2], most notably dealing with disclosure[3] provision:

a. violation of Real Estate Settlement Procedures Act, (RESPA), 12 USC §2601 throuh §2617;
b. violation of disclosure provisions of RESPA and 24 CFR pt 3500, Regulation X, Z;
c. violation of Escrow accounting provisions of 12 USC §2609(c) (1) and (2);
d. violation of Escrow disclosure provisions of RESPA, at 12 USC §2605 (g) and (f);
e. violation of force place insurance in violation of disclosure mandated by 12 USC §2603[4]
f. violation of corporate identity disclosure requirement of RESPA and Regulation X,Z;
g. violation of Merger and Acquisition disclosure requirements per RESPA and Regulation X,Z;
h. violation of notification of change of servicer per 12 USC §2605 (a),(b),(c),(d);

---

[2] Brief in Support shall be detailed in support of each such charge.
[3] Disclosure is the term in RESPA that corresponds to the historical legal concept of contract conditions precedent
[4] See Brief in Support discussion of UNIFORM SETTLEMENT STATEMENT, HUD-1, MODEL DISCLOSURE.

← p i6

i. violation of disclosure requirement to notify of change of ownership of creditor per , 12 USC §2603 and 12 USC §2605 (a),(b),(c),(d); and Regulation X and Z, at 12 CFR §§226.5, 226.9, 226.17 and associated brief in support;

j. failure to file timely and accurate titles, deeds, mortgages, (legal paper), thus disclosure violation per 12 USC §2603 and §2605 (a),(b),(c),(d); and Regulation X and Z, at 12 CFR §§226.5, 226.9, 226.17 and associated brief in support;

k. failure to meet contract conditions precedent[5] identified by RESPA, re: billings and charges,

l. charging of plaintiff for fees and charges never disclosed anywhere in contract, per all the statutes contained herein;

m. declaring plaintiff in default on very day he is overpaid on account in violation of RESPA;

n. failure to satisfy 12 USC §2605 (e) for Qualified Written Request;

o. filing false credit report at time plaintiff is overpaid, in violation of 12 USC §2605(e)(3);

p. illegal seizing of property based upon false and unfounded affidavit(s) and declarations, thus violating statute of frauds via intentional violation of 12 USC §2603 Uniform Settlement Statement;

q. defendant(s) were never disclosed as required by these many statutes and further, never at any time did they properly and legally register titles, deeds, mortgages, or other instruments with the Probate Judge of Randolph County, Alabama, as required by law. Failing the Probate registration is yet another in a litany of disclosure failures of these many statutes; and

all said violations plus other violation in denial of rights, privileges and immunities guaranteed plaintiff by Constitution of The United States.

9. This systematic pattern of conduct consists of a large number of individual acts of unconstitutional deprival of legal rights and a large number of violations of consumer protections found in RESPA, 12 USC §2601 to §2617; and Regulation(s) X and Z; thus, (i) Defendant(s) made a false statement(s) regarding a material fact; and, (ii) Defendant(s) knew or should have known the representation was false; and, (iii) Defendant(s) intended that the representation induce plaintiff to act on it; and, (iv) Plaintiff suffered damages in justifiable reliance on the representation; with all deprival of rights and consumer protections visited on plaintiff by defendant(s) and each of them, and under color of law. These illegal acts, while carried out under color of law, have no excuse in law, and are instead, gratuitous, illegal, improper, and unrelated to any activity in which defendant(s) corporations may appropriately and legally engage in the course of business transactions.

---

[5] Synonymous with DISCLOSURE requirement of RESPA. (See Brief in support)

10. Despite the fact that defendant(s) knew or should have known of the fact this pattern of conduct was being carried out, defendant(s) have taken no action, step or effort to order a halt to this course of conduct, to make redress to plaintiff or to take any disciplinary action whatever against any of their employees or fellow defendant(s) corporations. Even upon receipt of plaintiff Qualified Written Request in complaint of their actions, and even though same letters were exchanged with the Alabama Attorney General, defendant(s) failed to take corrective action. Instead, they have grown revenues exponentially as a direct result of their illegal and abominable acts.

FACTUAL ALLEGATIONS  (Brief's in support)
11. Overview of Material Facts
12. Motive Intent and Opportunity
13. Disclosure Definition per statute
14. Fraud Treatise
15. Servicer and Disclosure Brief
16. Disclosure Fraud at Inception of Mortgage
17. Misapplication of Major Payments
18. Monthly Disclosure and Escrow Violations
19. Default Fraud and Related Disclosure Violations
20. Qualified Written Request, Failure by Defendant(s)
21. Identity Fraud, Disclosure Violations of Defendant(s)
22. Fraud at Foreclosure by Homesense and Defendant(s)
23. Damages, Brief In Support

ALLEGATIONS AS TO DAMAGES

24. As a direct and proximate result of the aforesaid acts of the individual defendant(s), and each of them, plaintiff suffered great injury, pain, mental and emotional anguish, from then until now, and will continue so to suffer in the future; and he has lost and will in future lose large sums of money by reason of being greatly humiliated and held up to public scorn and derision as a result of foregoing acts of the defendant(s). All damages and statutory penalties are found primarily in 12 USC §2605(f) and will be properly detailed in appropriate brief in support. Plaintiff will continue to be adversely affected by and suffer losses from:

4

Damage to 4 generations of family reputation in Randolph County; and,
Damage to personal reputation; and,
Damage to 30 years of Professional reputation; and,
Damage to 20 years of political aspirations; and,
Loss of Ancestral Homeplace of 70 years; and,
Prevention of professional job opportunity; and,
Substantial injury leading to elimination of professional income; and,
Damage from Slander; and,
Declining Health issues due to economic damages removing money to pay for health care.

24. a)  The personal accomplishments of George McCarley with regard to political and

business results and corporate turnaround record of 14 major successes, absolutely demand such

individual have a publicly searchable record free of the blemish of negative information just such as

that illegally affixed by the improper actions of defendant(s).  Such negative information as

defendant(s) have used to slander plaintiff, serves as a giant roadblock to the ongoing career of

plaintiff.  In this era in which eighty percent of corporate employers openly advise that thorough and

total background checks will be conducted prior to interview, such slander as imposed by

defendant(s) consists of a "near" "death sentence."

24. b)  Whereas plaintiff was a rising Chief Executive Officer candidate and corporate

officer, as will be proven at trial, the damages to plaintiff future become extreme and of multi-

million dollar loss.  Said actions of defendant(s) may have resulted in the utter destruction of any

chance plaintiff will have to recover that status ever again.

25.  Wherefore plaintiff demands judgment against the defendant(s), and each of them,

jointly and severally: (a) to redress the loss of disseised ancestral property, in the amount of twenty-

six thousand ($26,000); and (b) to compensate ongoing property damages in the amount of ten

thousand ($10,000); and (c) to redress five years of lost professional income resulting from slander,

breach, fraud and RESPA, in the amount of five hundred thousand ($500,000); and (d) to

compensate the cost of court costs and related legal and research expenses in the amount of ten

thousand ($10,000); and (e) compensation for mental anxiety in the amount of two hundred thousand ($200,000); and (f) compensation for emotional distress in the amount of two hundred thousand ($200,000); and (g) compensation for advanced and untreated medical conditions by providing a lifetime medical insurance policy in the amount of two hundred thousand ($200,000); and, (h) statutory damages for defendant(s) violation of 12 USC §2605 in the amount of Fifty Thousand ($50,000); and, (i) removal of illegal negative credit information in all types and locations, to include removal of bankruptcy filed for no other reason than avoidance of this action; and, (j) vacating of any and all negative legal paper filed by defendant(s); and, (k)plaintiff further demand judgment for slander, breach, fraud and RESPA damages against the defendant(s), and each of them, jointly and severally, in the amount of seven years of minimum level CEO compensation of Seven Million ($7,000,000); and, (l) that defendant(s) shall pay the full tax burden of any and all awards estimated at Five Hundred Thousand ($500,000).

26. On or prior to May 1, 2000 and continuing forward to the present, Defendant(s) and others unknown to plaintiff, and each of them, in violation of 12 USC §2605, The Real Estate Settlement Procedures Act, and related provisions of Regulation(s) X and Z; and further in violation of the statute of frauds, and further in breach of contract, as per the foregoing paragraphs and briefs in support; for purposes of hindering, impeding or obstructing the due course of justice guaranteed by the United States Constitution, did injure plaintiff McCarley by acts leading to illegal foreclosure and for lawfully attempting to maintain his rights under the Constitution and laws of The United States.

27. In furtherance of the object of said violations, one or more defendant(s) did do or cause to be done the acts set forth in paragraphs 1 through 23 of this complaint and, in violation of statutes denoted herein, did thereby injure plaintiff in his person, set forth in paragraphs 24 through 26, and

did deprive him of having and exercising his rights and privileges under the Constitution and laws of the United States.

28. Wherefore plaintiff McCarley claims damages in the amount of Eight Million Six Hundred Ninety Six Thousand ($8,696,000), against the defendant(s) jointly and severally, plus interest and any non-itemized costs of this court action.

Respectfully submitted

George D. McCarley, Pro Se
216B Chestnut Street
Roanoke, Al 36274
334-863-6489

## PROOF OF SERVICE

I, George D. McCarley, do swear or affirm that on this date, April 31, 2007, as required by Supreme Court Rule 29 I have served the enclosed ACTION on each party to the above proceeding or that party's counsel, by depositing envelope containing the above documents in the United States Mail properly addressed to each of them, and with first class postage prepaid, or by delivery to a third party commercial carrier for delivery within 3 calendar days.

The Clerk
Middle District of Alabama, Eastern Division
One Church Street, PO Box 711
Montgomery, Al 36101-0711
334-954-3600

Defendant Attorney
Mr. George Parker
Bradley Arant Rose and White
Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, Al 36104
334-956-7671, 956-7700

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 31, 2007

George D. McCarley

7

OVERVIEW OF MATERIAL FACTS OF CASE
Material Fact will be converted to EVIDENCE via AUTHENTICATION

1.   This is the case of George McCarley versus a vast international banking empire[6]. McCarley executed a mortgage with this defendant bank in May 1, 2000, (Doc # 19 exhibit 1). The bank (defendant) quickly began to engage in abuse, intimidation, harassment, and other serious violations of federal and state law. McCarley continually complained about their breaches of law and instead of correcting their mistake, The Bank declared foreclosure illegally and took the ancestral home of this American veteran.

2.   Weight of the evidence against The Bank is considerable. As a result of our investigation, we will demonstrate to the jury, motive of the bank as well as how they manufacture opportunity (foreclosure in their view). The trial will not only prove the guilt of The Bank against McCarley; but will also prove a pattern of practice of illegal methods leading to the highest credit losses[7] of any major bank in America; further evidence that said credit losses are converted into a tax advantage that makes them the highest profit bank in America (footnote above). This same evidence will indicate they are engaged in the greatest Tax Scam in human history[8].

3. Our evidence will prove McCarley discovered the more sinister activities of the tax scam very early in the mortgage[9]. He complained to the Alabama Attorney General[10] and proved with records of the Secretary of State, the bank was not authorized to do business in Alabama[11]. The Bank then set about to do anything in their power to discredit McCarley, -- and what better way than with a foreclosure that fully prevents McCarley ability to earn professional income. The evidence

---

[6] 43 Identities begin page 26 below
[7] Doc # 19, Exhibits 67, 68, 69
[8] see exhibit 24 indicating several entities claiming same asset
[9] Letter to Ala. Attorney General, (Doc # 19, exhibits 51, 52, 53, 54)
[10] Ala AG letter of April 16, 2001 suggests McCarley get a lawyer or take the issue to Small Claims.Court
[11] Doc #19, Exhibits 26 thru exhibit 33 – plus expert witness from those offices

will, for example, prove that McCarley was fully paid up[12] on the day the bank named an "Assignee." McCarley will further prove he was fully paid up[13] after 30 months, and that when he ordered the bank to correct their illegal billing practices, they moved to foreclosure, violating federal law in the process. The evidence will prove unacceptable accounting practices[14] and extreme disorganization of this major bank[15]. Our evidence also proves The Bank is engaged in a constantly evolving "shell game" – that they utilized over 43 different identities[16] in the short life of this mortgage and legal action – fully in violation of Federal disclosure laws found in RESPA, 12 USC §2601 to §2617; and Regulation(s) X and Z.

4. We will prove extreme damage[17] to the person of McCarley, as he was on course to become CEO of a major corporation (Doc # 19, exhibit 61, 62, 64) and that the actions of this bank prevented that goal; then McCarley suffered severe financial losses, has not worked professionally since their illegal act named an assignee in 2002 (Doc #19, ex 24) (when he was fully paid)(ex 37), suffered severe emotional and mental distress, while experiencing medical conditions that could have easily been remedied given the ability to pay for medical care, -- an ability blocked by the actions of the bank.

5. What McCarley will prove with official documents as evidence:
1. The Banks Lied on Disclosure at mortgage inception
2. The Banks violated disclosure almost monthly throughout the mortgage
3. The Banks never complied with most important Disclosure requirements
4. That Lies and Disclosure violations rise to level of Fraud, Perjury, and criminal continuing violations as defined by FDIC, FHA, HUD, etc.
5 The Banks Lied about default, that billing statements prove there was no default.

---

[12] See Billing Statement from Household
[13] Ibid
[14] Doc #19, Exhibits 37, 46-50, and 55
[15] 43 Identities beginning page 27
[16] Ibid
[17] Doc #19, Exhibits 61 thru 66

6. The Banks never intended to allow McCarley to payoff his mortgage, that they conspired from inception to create conditions that would force McCarley to foreclose and prevent his ability to fight the foreclosure.

7. The Banks inflicted extreme damage to McCarley as a result, ruining his life and career.

6. Evidence will be introduced consisting of officially recorded deeds, mortgages, Secretary of State Corporate documentation, and HFC billing records that will uphold the 7 points above, while proving the following:

A. The Banks all lied instead of Disclosing information properly.

B. Bank lies were intended to cover their attempts to hide assets.

C. Bank lies were intended to reduce their tax liability by maintaining high foreclosure rates.

D. Homesense Financial lied on day one, as McCarley was signing the mortgage. The law required that they disclose the name or identity of any subsequent creditors or servicers. They actually merged with another organization within that first week and did not disclose same. This is part of their continuing efforts to hide assets and tax liability.

E. HFC/HSBC never at any one time recorded their presence or their claim to deeds or mortgages at the Randolph County Courthouse or any place else, therefore having no standing before courts.

F. HFC never disclosed that they were the lender.

G. HFC never disclosed any of the required information whatsoever. HSBC never disclosed any information whatsoever.

H. It is important to this proceeding to establish whether either HFC or HSBC holds any factual status as lender or servicer. Proper determination of this point might well result in criminal theft charges being filed against either HFC or HSBC or both.

I. Escrow accounts were expressly forbidden by this mortgage. That will be proven by several paragraphs of the actual mortgage contract. Despite this fact, HFC/HSBC followed a practice of charging monies to escrow AND NEVER NOTIFIED GEORGE MCCARLEY, thus channeling money away from principal so as to make it appear McCarley had not paid in full.

J. Certain payments of McCarley never appear on the billing summary.

K. As many 77 DISCLOSURE VIOLATIONS appear on the billing summary for the FINAL 15 MONTHS ALONE. These will be tendered as evidence in detail.

L. Monthly billing statements in evidence will prove none of The Banks had any intention of being honest. Instead, they can't even construct credible billing statements.

M. An attempt to force place insurance is in evidence, although McCarley had his own insurance in effect and that documentation was in evidence by Homesense and on several evidence documents.

N. That The Banks never corrected any mistakes while mistakes were being complained of on a monthly basis. Failure to correct exposes The Bank to RESPA liability.

O. An inescapable conclusion begins to develop now, that HFC/HSBC/Homesense are involved in a deliberate pattern of deceit, lies and conspiracy intended to make McCarley look like a bum so that he does not have the resources to fight the ongoing atrocities committed by these banks.

P. The bank conspiracy extends to their acts of, (1) hiding assets, (2) attempting to foreclose huge numbers of people to keep their "write-offs" high and their tax liability low.

Q. What else would anyone expect from the preferred bank of Saddam Hussein.

MOTIVE INTENT OPPORTUNITY
(Brief in Support)

.

1. The legal theories of this brief are not required to be proven in this pleading. However, it is important to those involved to understand the psychology of the operation of defendant(s)

2. Exhibit 67, 68, 69 attached to Doc 19 makes it clear defendant is one of the most profitable banks in the world. Same exhibit makes it clear this defendant has one of the highest bad debt ratio's of any profitable company. The counterintuitive nature of high profits in the face of extreme bad debts should raise many questions in the mind of anyone cognizant of these facts.

3. Typical business school curriculum teaches that bad debts of 2.5% are dangerous and that bad debts in excess of 3.5% could quickly lead to bankruptcy. How then, does HSBC (defendant) make record profits given bad debts in excess of 10% for several years duration?

4. Plaintiff is prepared to prove at trial that HSBC has a process of identification of prime properties that if foreclosed will lead to very high returns for the bank. There are many foreclosures in Alabama, known to plaintiff that both provide and prove the model presented by this brief.

5. In the case of plaintiff foreclosed property, the following conditions provided by plaintiff put him in position to be a target of foreclosure by defendant.

   a. He only financed 65% of value of home.
   b. Mortgage was for $26,000 with property appraised at $44,000.
   c. Within 200 feet are two properties appraised near $200,000, and $450,000.
   d. City is known to have depressed property values
   e. Ease of access to major metropolitan areas
   f. foreclosed property value could only go up.
   g. defendant discovered it was ancestral property and plaintiff would pay more
   h. appraisal showed property could be improved to six figures.

6. Plaintiff and other examples known fit this mould. Defendant simply identifies such targets and has safety in knowledge that plaintiff will continue to pay more and more in an attempt to prevent foreclosure. Following ultimate foreclosure, the defendant will reap windfall profits on the

speculative real estate market. This example is so well proven that the major Real Estate Firm RE/MAX and many law firms are involved in some fiduciary relationship with the defendant.

7. The mortgage was for a period of 20 years, at the end of which defendant would have earned $60,000 on total payout. In this case, Plaintiff remitted over $11,000 to defendant in 30 months. Defendant assigned and sold property for $22,000 and then declared write-off of the asset. This provided a $60,000 impact on the bottom line in just 30 months whereas the plan called for $60,000 in 20 years. The defendant collections group looks like hero's. In fact, HSBC (defendant) assigned, sold, then reacquired the property to further increase the total impact on the bottom line.

8. Plaintiff provided defendant further motive and intent to foreclose as a result of certain complaint actions initiated by plaintiff. Plaintiff attempted to correct his mistake of 65% mortgage in the first few months of mortgage. He discovered defendant had many internal problems and was not properly registered in State of Alabama. When defendant could not or would not work together on a refinance plan, McCarley complained to the Alabama Attorney General Office of Consumer Affairs. This office will authenticate McCarley official Qualified Written Letters of Complaint, and same will make it clear McCarley discovered the failure to be registered, which according to Alabama law, prevent a company access to Alabama courts. In the same process, defendant lied to AG about certain disclosures of the mortgage. AG completed his attempts to intervene by informing McCarley he should involve an attorney. Obviously this series of actions was very negative to a defendant intent on establishing operations in all states and countries. Therefore, the die was cast and defendant had no option except to discredit McCarley by any means possible. What better than a quick default and foreclosure.

9. Defendant has perfected many means of FORCING a debtor to default on conditions precedent. This defendant process seems to begin in the form of a "scam" that continues until the defendant establishes a position from which he can exercise *duress*.

10. The scam begins as early as first month of the mortgage. Debtor will receive a call from the new mortgage creditor or servicer in which debtor is told creditor has not received proof of insurance. Plaintiff will prove at trial the near impossibility of this issue, as the standard HUD-1 Uniform Settlement Statement and other standard HUD mortgage contract pro forma's contains several locations at which the presence or absence of required insurance is noted. However, this is step one of the scam. The debtor then goes through several months of hassle in which several times, debtor faxes copies of insurance coverage to defendant. Ultimately, debtor receives a demand call, and he is told he must pay money for insurance or the legal department will become involved. This element of duress is difficult to overcome. The consumer does not learn until investigation of details following foreclosure that his normal payments are being channeled into escrow in the name of insurance payments and his credit rating is in decline as a result of these fraudulent actions.

11. Not satisfied with the insurance scam, defendant early on, begins what appears to the debtor to be "nice customer service calls." (i) Defendant would call at night as a courtesy to learn if debtor were happy. (ii) Next month, defendant makes same call and asks if payment will be mailed on time. (iii) Next month, defendant calls and asks if debtor can mail payment by end of week. Debtor agrees and then looks to discover his payment is not due for two more weeks – therefore he holds payment until normal billing interval. Unknown to debtor, the defendant has indicated on the billing summary statement that payment is incoming. When payment is not received early as agreed (over phone), defendant calls and demands payment, although still in advance of contracted due date. (iv) Debtor is now becoming confused about payment dates. This is similar to a technique used by

13

the Nigerian Scam in which they attempt to disorient the victim before going for the money.  (v)

This method ultimately makes the body of the Billing Summary Statement look terrible by virtue of

the many reversing entries that become necessary.  Subsequently, when the billing summary is sent

to credit agencies or the legal department, they think the debtor is a bum with all these reversing

entries and the debtor is treated like a bum who doesn't pay his bills, regardless of the facts.

12. Not satisfied with the above two scams, defendant then begins to bill debtor for monthly

amounts higher than contracted.  Debtor typically calls and notifies the defendant of mistake and

makes normal payment.  Then the amount of payment seems to continue to be billed at the higher,

noncontracted amount.  Consumer calls in a complaint.  This continues throughout the mortgage.

Ultimately, debtor gets call demanding payment of higher fees or the legal department will get

involved.  Debtor informs of the error and demands defendant get his facts straight.  Defendant

becomes obstinate and demands payment or else.

13. During scams above, debtor may become confused and actually make a higher payment

as demanded.  This would trigger a change in the monthly amount billed to reflect the higher

amount.  TILA and most states consumer codes demand that higher than normal payments be

credited first to principal and then to interest, however, defendant never applied in this manner.

14. In all the scam actions of this defendant,

(1) Defendant(s) made a false statement(s) regarding a material fact, thus, defendant
fraudulently disclosed, or, fraudulently ignored condition precedent(s) of the
mortgage contract; and

(2) Defendant(s) knew or should have known the representation was false, thus,
defendant knew or should have known the fraudulently disclosed or ignored
conditions precedent(s) as represented by defendant(s) were false; and

(3) Defendant(s) intended that the representation induce plaintiff to act on it, thus, the
defendant(s) made fraudulent disclosure or ignored conditions precedent(s) with
intent that plaintiff act based upon defendant(s) misrepresentation; and

14

(4)Plaintiff suffered damages in justifiable reliance on the representation, thus, plaintiff incurred damages in justifiable reliance on the fraudulent disclosure of conditions precedent(s) as represented by defendant.

15. There exists a huge body of case citations under Common Law Contracts, Fraud, and other codes that makes it clear these acts of defendant have been well known to the courts for many decades and that defendant acts in violation of these codes are not allowable in any form or fashion under either common law or under the statutory of construction of TILA or RESPA.

16. See Doc #5, page 40 and 41 for notable case citations upholding the claims made in this brief in support, from 17 AmJur Contracts §§701, 702, 703, 716.

17. It should be clear from the above that defendant has many methods with which to force the default of debtors. It should also be clear the McCarley property held all the attributes of a target. And lastly, it should be clear that earlier courts established very heavy sections of case citations deciding against such actions of banks and this defendant should be well versed in those outcomes by virtue of their status as a National Bank.

## *DISCLOSURE* DEFINED  (Brief in Support)

"This chapter refers to a transition in Congressional policy from a policy of let-the-buyer-beware to one of let-the-seller-disclose" Allen v. Beneficial Finance, D.C.Ind, 1975, 393 F.Supp.1382, affirmed 531 F.2d 797[18]

1. The process known as DISCLOSURE may be considered the same as the more familiar concept of *contract conditions precedent*. The balance of this brief should leave no doubt that a creditor that violates *disclosure* has performed an illegal action almost identical to a *Breach of Contract* or a *breach of conditions precedent*. The legal codes known as RESPA and TILA, with Regulation(s) X and Z, were created almost simultaneously and were heavily authored influenced and amended by the CRANSTON GONZALEZ amendments. Mr. Cranston of Rhode Island and Mr. Gonzalez of Texas crafted TILA to apply to all credit transactions along with some mortgage transactions and RESPA to apply more specifically to Real Estate transactions. In practice, many of the operative definitions and legal code are similar. The single most important element of both codes is found in the word and phrase *DISCLOSURE*. Infra *Allen* is a case decided against a former subsidiary of defendant Household International. The citation should make it clear this group of defendant banks has not learned the true definition of *DISCLOSURE* since the 1975 decision above.

Definitions

*Webste*r definition of disclosure: *DISCLOSE*:  to unclose; to reveal; to divulge; to bring to light.

*Blacks Law Dictionary* definition of disclosure:

> *Disclosure*. n.  The act or process of making something known that was previously unknown; a revelation of facts <a layer's disclosure of a conflict of interest>

2. RESPA definition of *disclosure* is established by the both of Regulation X and Z, along with  the 12 USC §2603 UNIFORM SETTLEMENT STATEMENT.  Through the years since passage of TILA and RESPA, this concept of Uniform Settlement Statement was found in several

---

[18] Beneficial Finance is a disgraced and now closed unit of DEFENDANT HOUSEHOLD INTERNATIONAL

statutes and has been called HUD-1, HUD-1a and a Model Disclosure Statement. The Secretary of

HUD is granted responsibility to establish and update the Uniform Settlement Statement.

　　　　3.  RESPA establishes authority[19] for the Secretary of Housing and Urban Development

to author and maintain "model disclosure statements." 24 CFR pt. 3500 is the Code of Federal

Regulations that maintains the model disclosure statement along with instructions for same. The

Model Disclosure Statement, presently called Uniform Settlement Statement governs both TILA

and RESPA transactions via further interpretation and rules established in Regulations X and Z.

> From 15 USC §1605,

> "If not itemized and disclosed, creditor needs to include that item in the computation of finance charge, even if the item is not a charge for credit." Dalton v. Bob Neil Pontiac, D.C.N.C. 1979, 476 F.Supp. 789, affirmed 628 F.2d 1348

> "it is also a "disclosure law" intended to protect the public from false and fictitious charges and to thus avoid the uninformed use of credit"
> White v. Arlen Realty & Dev , C.A.Md 1975, 540 F.2d 645

> "This chapter refers to a transition in Congressional policy from a policy of let-the-buyer-beware to one of let-the-seller-disclose"
> Allen v. Beneficial Finance, D.C.Ind, 1975, 393 F.Supp.1382, affirmed 531 F.2d 797

Key Citation from notes to US Code 15 USC 1601 *et seq:*

> "Failing to inform consumers about the cost of credit is the evil which this chapter was designed to prevent." Ecenrode v. Household Finance Corp. of South Dover, D.C.Del.1976, 422 F.Supp. 1327

　　　　4.  This demonstrates precisely why statutory penalties for failure to disclose are so high.

This explains why the present Congress is in process of doubling statutory penalty amounts. This is

precisely why the very first line of 15 USC 1638 reads as follows:

> **Sec. 1638. - Transactions other than under an open end credit plan**

> (a) Required disclosures by creditor

---

[19] This authority statute has been moved around several locations and in 1996 was located at 12 USC §§2603, 2617

For each consumer credit transaction other than under an open end credit plan, the creditor shall disclose each of the following items, to the extent applicable:

(1) The identity of the creditor required to make disclosure.

5. McCarley has charged and will continue to charge that HSBC and the group of (5) defendants have never been in compliance with terms of the contract and therefore, no condition of default or foreclosure can possibly be deemed just. Citation from US Code for 15 USC 1638 (TILA)

"In view of the determination that lender violated this subchapter by failing to disclose terms in its statement of disclosure fairly and conspicuously and in meaningful sequence, further proceedings were not necessary with respect to borrowers contention that they were entitled to summary judgment on claim that lender violated this subchapter by failing to disclose . . . "   Conrad v. Beneficial Finance Co. of New York Inc., 1977, 394 NYS2d 923.

6. The intent of Congress is further upheld by the Courts as evidenced by the following opinions found in US Code notes upholding 15 USC 1640.

"Congress sought in this section to vest considerable enforcement power in **private attorneys general,**" individual borrowers who by suing lenders for alleged violations could achieve widespread compliance without government intervention." Bizier v. Globe Financial Services, Inc., C.A.Mass 1981, 654 F.2d 1.

"Provision of this section that any creditor who fails in connection with any consumer credit transaction to disclose required information shall be liable . . ." Kelly v. Beneficial Finance Co. of Alabama, Ala.CivApp. 1979, 374 So2d 338, writ denied 374 So2d 340

"Construction is to be liberally construed in favor of borrowers." Allen v. Beneficial Finance Co., D.C.Ind, 1975, 393 F.Supp.1382, affirmed 531 F.2d 797

Notes to the §1601 entitled PURPOSE GENERALLY provide the following applicable citations:

"This chapter is designed to prevent unscrupulous and predatory creditor practices" Littlefield v. Walt Flanagan & Co., C.A. Colo 1974, 498 F.2d 1133.

DUTY TO DISCLOSE EVEN THE SMALLEST DETAILS
(Taken from Prof. Gene Marsh treatise: A Practitioners Guide to the New Alabama Mini-Code)

18

*Gene A. Marsh* [\* Professor of Law, The University of Alabama School of Law and Member, 1996 Governor's Task Force on the Mini-Code. J.D., 1981, Washington and Lee University; B.S., 1978, M.S., 1978, Ohio State University. I am grateful to The University of Alabama Law School Foundation and the Bruce Strother Memorial Research Fund for research support. I would also like to thank attorneys Hank Hutchinson and Holt Speir who worked with me on a Mini-Code continuing education seminar for the Community Bankers Association of Alabama. Thanks also to law students Kirby Williams and Joel Connally for their help with this Article.]

III. The 1971 Enactment

Shortly after the 1971 enactment of the Mini-Code, practitioners and commentators described the statute as marked by "deficiencies, ambiguities and inconsistencies. "[Galloway, supra note 11, at 448.] Neither the passage of time nor a number of amendments prior to 1996 made the law easier to understand for those using the Mini-Code offensively, defensively, or in structuring their consumer installment sales contracts or loan documents. Although for many years the Mini-Code lay largely dormant, several major cases decided in the 1990s caused consumer credit to be at the forefront of the debate over reform of the civil laws in Alabama. Although several of those cases will be reviewed below, probably no case in Alabama has had a greater impact on the consumer credit industry than *Smith v. First Family Financial Services* [ 626 So. 2d 1266 (Ala. 1993).] which launched numerous lawsuits and resulted in an immediate amendment to the Mini-Code, as well as provided some of the momentum which led to the 1996 Mini-Code revisions. This case deserves special treatment among the major Mini-Code cases of the 1990s because its effect is still being felt, even after enactment of the revised Mini-Code.

### B. The Surprise Duty to Disclose

In *Smith*, the Alabama Supreme Court surprised the financial community by providing an avenue for a fraudulent suppression claim, even where all disclosure requirements under the Mini-Code and TILA were thought to have been satisfied. [See Smith , 626 So. 2d at 1272-73.] In *Smith*, the court reversed and remanded the trial court's entry of summary judgment for the defendants in an action challenging the "yield spread premium" in a table funded loan. [See id. at 1269. In a "table funded" loan, the mort gage broker completes all of the originating functions usually in the name of the mortgage broker. See id. The mort gage broker closes the loan but relies on the advance of funds sup plied by the mortgage lender, which of ten occurs simultaneously with the loan closing. See id . Once the loan is closed, the mort gage broker immediately assigns the mort gage to the lender. See id. Although the mort gage broker is identified as the creditor and may be the only entity dealing with the borrower, the assignee-lender is the source of the funds. See id]

A yield spread premium is generated when a "loan" is written by a broker (or car dealer finance and insurance office) at a higher interest rate than the assignee requires. [See generally David B. McCrae, Yield Spread Premiums and Discounts in Sub-Prime Auto Financing, The Conference on Consumer Finance Law, Sub-Prime

Mortgage Lending and Auto Finance (Feb. 8-9, 1996) (on file with author).] The broker (or car dealer) retains all or a portion of the difference as an "origination fee" or as compensation for handling the transaction before the paper is assigned to the mortgage lender, bank, or finance company. The yield spread premium is often calculated by taking the present value of the rate spread and is either paid directly by the assignee back to the originator or entered in a "reserve" out of which payments are periodically paid to the loan originator or car dealer. In the event there is a recourse arrangement between the loan originator (dealer) and assignee, the reserve may be tapped by the assignee in cases where the consumer loans do not pay out.

Critical to an understanding of the hoopla surrounding *Smith* and the other yield spread cases is that *the annual percentage rate (APR) on the loan was accurately disclosed to the borrower*. [See Smith, 626 So. 2d at 1269. The annual percentage rate (APR) is the actuarially correct yearly interest rate expressed as a percentage. The term is de fined at 15 U.S.C. § 1606(a) (1994).] It is also fair to say that based on the facts of *Smith* and the relevant Mini-Code section which imposes a five-point cap on origination fees, the *Smith* result was not fantastic. [ See Smith , 626 So. 2d at 1268-71; see also Ala. Code § 5-19-4(g) (1996) which pro vides: (g) A creditor may, pursuant to a consumer credit transaction contract se cured by an interest in real property, charge and collect points in an amount not to exceed five percent of the original principal balance in the case of a closed-end consumer credit transaction, or five percent of the total line of credit in the case of an open-end credit plan. Points may be paid in cash at the time of the consumer credit transaction, or may be deducted from the proceeds and included in the original amount financed for the purposes of Section 5-19-3 or financed under the open-end ed credit plan. Points shall be in addition to all other charges, are fully earned on the date of the consumer credit transaction, and may be excluded from the finance charge for the purpose of computing any finance charge credit or re fund.] Indeed, the loan broker in *Smith* evidently did receive a total compensation that exceeded the five-point limit, and as the Alabama Supreme Court noted, the federal Real Estate Settlement Procedures Act of 1974 now requires disclosure of the loan broker's fee in most table funded arrangements. [See Smith , 626 So. 2d at 1272. The Real Estate Settlement Procedures Act of 1974 is found at 12 U.S.C. §§ 2601-2617 (1994). Regulation X, 24 C.F.R. pt. 3500, which implements The Real Estate Settlement Procedures Act, details a number of mortgage broker disclosure requirements. See Kathleen E. Keest, The Cost of Credit § 11.3.1 (1995).] But rather than focus on the particulars of *Smith* as they relate to real estate lending and disclosure of loan brokers fees in real estate loans, it is more important to focus on language in the opinion that generated a number of lawsuits and the damage control undertaken by the Alabama Legislature by way of a Mini-Code amendment.

In *Smith*, the court declared that the Mini-Code requires full disclosure of all finance charges, whether direct or indirect, and by whatever designation. [See Smith, 626 So. 2d at 1271.] The court found a failing of First Family or EquiSouth (the loan broker) to disclose the compensation the broker was receiving through the yield spread premium. [See id. at 1271-72.] The court noted that such payments to the loan broker "are part of the total finance charges borne by the borrower under the Mini-Code,

and, as such, are required to be disclosed to the borrower under Alabama law." [Id. at 1272.] The analysis in the case is driven by whether the plaintiff produced sufficient evidence to support the contentions and thereby create a genuine issue of material fact (making summary judgment improper). [See id. at 1272-73.] However, it was the language in *Smith* holding a "duty to disclose under the Mini-Code" which became the linchpin in subsequent lawsuits. [See id. at 1272.]

The "duty" component of *Smith* allowed plaintiffs to satisfy what had been a missing element in the attempt to use a fraudulent suppression claim in consumer credit cases. To establish a prima facie case of suppression of a material fact under section 6-5-102 of the Code of Alabama, a plaintiff must show (1) that the defendant had a *duty* to disclose a material fact, (2) that the defendant concealed or failed to disclose this material fact, (3) that the defendant's concealment or failure to disclose this material fact induced the plaintiff to act or to refrain from acting, and (4) that the plaintiff suffered actual damage as a proximate result. [See Hines v. Riverside Chevrolet-Olds, Inc., 655 So. 2d 909, 918 (Ala. 1994); Dodd v. Nelda Stephenson Chevro let, Inc., 626 So. 2d 1288, 1293 (Ala. 1993); Soniat v. John son-Rast & Hays, 626 So. 2d 1256, 1258 (Ala. 1993); Bak er v. Bennet, 603 So. 2d 928, 934-35 (Ala. 1992).] Although attempts to create a duty to disclose in a lender-borrower relationship had been tried through other routes (fiduciary relationship, inequality in bargaining power, etc.), these attempts were largely unsuccessful. The reading of *Smith* that was most commonly applied by the plaintiff's bar provided instant access to a fraud theory, but by way of a failure to disclose under the Mini-Code.

8. Alabama legislature has continued to amend the Mini-Code so as to make the code more

applicable to today's creditor and debtor requirements. Each amendment broadens the definition and

application of the process of disclosure, as exemplified by the following cases cited by Marsh.

### C. The 1994 Mini-Code Amendments

The questions of whether the 1994 amendment to the Alabama Mini-Code resolved the "duty to disclose" issue has recently been answered, but not in the creditor's favor. In ***Bramlett v. Adamson Ford***, [ No. 2950526, 1996 WL 730853 (Ala. Civ. App., Dec. 20, 1996).] the Alabama Court of Civil Appeals reversed a summary judgment that had been granted in favor of a car dealer and assignee in a yield spread premium case. [See Bramlett , No. 2950526, 1996 WL 730853, at *4.] The court noted that although the 1994 amendment to section 5-19-6 established that there was no duty to disclose yield spread financing under the Mini-Code, section 5-19-6 "does not mean that a duty to disclose such a discount cannot arise from other circumstances."[Id . at *3.] The plaintiff in *Bramlett* alleged that he had asked the agent of the car dealer why the interest rate was so high and was told that the rate was high because he was a "poor credit risk." [See id. at *2.] The Alabama Court of Civil Appeals reasoned that under such circumstances where the consumer inquires as to the rate, the trier of fact could infer that the car dealer had a duty to disclose the

21

full nature of the commission to be earned by a sharing of the interest rate, which in this case resulted in a three percent commission for the car dealer. [See id. at *3.] Thus, the theory of *Bramlett* offers another end-around a Mini-Code amendment that was carefully written to head off yield spread litigation based on a duty to disclose under the Mini-Code. The *Bramlett* decision has been described as a "bombshell" by the Alabama Automobile Dealers Association. [ See Phillip Rawls, Salesmen Must Tell All Truth, Court Says , Birmingham News , Jan. 12, 1997, at D1.]

CONTRACT CONDITIONS PRECEDENT VERSUS DISCLOSURE

9.   Another primary example leading to a more complete understanding of the term *disclosure* and Congressional intent for application of *disclosure* is to compare the concept of *disclosure* to the older *common law* concept of *conditions precedent*. Simply stated, under common law, the conditions of the contract were expected to be explained and fully delineated within the contract. Any failure of either party to the contract to fully adhere and abide by those *conditions precedent* could be considered grounds for *breach of contract*. Likewise, a creditor's failure to *disclose* or abide by any condition *disclosed*, is grounds for penalty under both TILA, RESPA, ALABAMA MINI-CODE

10.  The most elementary summation of the definition and expectation of the legislature in drafting RESPA is that all possible factors that will affect consumer decisions is expected to be fully and fairly *disclosed*, as may be found in the following case citation:

> "This chapter refers to a transition in Congressional policy from a policy of let-the-buyer-beware to one of let-the-seller-disclose"
> Allen v. Beneficial Finance, D.C.Ind, 1975, 393 F.Supp.1382, affirmed 531 F.2d 797

Of fourteen (14) cases cited in this *Disclosure* brief, please note that five were assessed against business units of the defendant HOUSEHOLD INTERNATIONAL. It is clear they have not learned their lesson as intended by Congress and state legislatures.

22

Brief in Support of charges that Creditor(s) Homesense and Defendant(s) failed to disclose required information at inception of mortgage, and that said acts constitute fraud and violation of RESPA. That such failure to disclose continued throughout the mortgage to include the termination of said mortgage. The totality of failure to disclose rises to such a level of fraud that we are presented a case in which "NO ENFORCEABLE MORTGAGE EVER EXISTED." Therefore, this foreclosure action is due to be reveresed and property title restored to rightful owner, Plaintiff McCarley.

BLACKS LAW DICTIONARY

DEFINITION OF DISCLOSURE

*disclosure*, n. The act or process of making known something that was previously unknown; a revelation of facts <a lawyer's disclosure of a conflict of interest>.

*compulsory disclosure,* A mandatory disclosure of information, as of matters within the scope of the discovery rules

*full disclosure*. A complete revelation of all material facts.

The definition of disclosure as applies to consumer credit requires reading a cross section of several authorities and legal codes. Perhaps best and most complete definitions are found in the text of code and citations under Truth in Lending Act, the complementary "cousin" statutes to RESPA.

Note 15 15 USC 1601 Protection from false charges

" . . . it is also a disclosure law intended to protect the public from false and fictitious charges and to thus avoid the uninformed use of credit." White v. Arlen Realty & Development Corp. C.A.Md.1975, 540 F.2d. 645.

15 USC 1631  Disclosure requirements

Note   Purpose of disclosure requirement
" . . . but only to ensure that certain information will be clearly and conspicuously brought to borrower's attention and not obscured by other information." Doggett v. Ritter Finance Co. of Louisa, D.C.Va.1974, 384 F.Supp 150

15 USC 1632  Form of Disclosure; additional information

(a) Information required by this subchapter shall be disclosed clearly and conspicuously, in accordance with regulations of the board. The terms "annual percentage rate" and "finance charge" shall be disclosed more conspicuously than other terms, . . ., except identity of the creditor.

Note 2.  Clear and conspicuous disclosure

See Notes of Decisions under sections 12 CFR 226.5 and 226.17 of Regulation Z set out following section 1700 of this title.

In McCarley, we have an issue with constantly changing identities of creditor and their subsequent failure to make any disclosure at all. The court is directed to recall the immediate merger of Homesense with up to 27 additional firms within just days of McCarley mortgage initiation. None of those subsequent mergers were reported or disclosed in any fashion. (See material fact exhibit from South Carolina Secretary of State indicating merger within week of disclosure, thus in violation of law) (See ematerial fact exhibit defining the 42 separate identities utilized, yet never disclosed by HSBC)

We charge this is an act of fraud. That Homesense and subsequent mergers (i)knew or should have known they were acting against material facts disclosed, (ii) they knew they were in error, (iii) they continued to make said mistakes, (iv) they injured McCarley in the process of this continuing series of fraudulent errors of failure to disclosure subsequent actions. That the failure of both Homesense and associated 27 firms as well as the Household/HSBC group of at least 42, (i)knew or should have known they were acting against material facts disclosed, (ii) they knew they were in error, (iii) they continued to make said mistakes, (iv) they injured McCarley in the process of this continuing series of fraudulent errors of failure to disclosure subsequent actions

12 CFR 226.9  Subsequent disclosure requirements

Whenever any term required to be disclosed under 12 CFR 226.6 is changed or the required minimum periodic payment is increased, the creditor shall mail or deliver written notice of the change to each consumer who may be affected. The notice must be mailed at least 15 days prior to the change.

In McCarley, and as relates to statute above, we have an issue with constantly changing billing, charges, and terms of creditor and their subsequent failure to make any disclosure at all. The court is directed to recall the immediate merger of Homesense with up to 27 additional firms within just days of McCarley mortgage initiation. None of those subsequent mergers were reported or disclosed in any fashion, and none of the constant changes in terms were disclosed in writing as required by statute.

We charge this is an act of fraud. That Homesense and subsequent mergers (i)knew or should have known they were acting against terms disclosed, (ii) they knew they were in error, (iii) they continued to make said mistakes, (iv) they injured McCarley in the process of this continuing series of fraudulent errors of failure to disclosure subsequent actions. That the failure of both Homesense and associated 27 firms as well as the Household/HSBC group of at least 42, (i) knew or should have known they were acting against terms disclosed, (ii) they knew they were in error, (iii) they continued to make said mistakes, (iv) they injured McCarley in the process of this continuing series of fraudulent errors of failure to disclosure subsequent actions

Note 3  Identification of Creditor

Where no approximation nor any explanation of absence of lenders identity from disclosure statements provided to borrower by mortgage loan broker was even attempted, . . ., did not excuse brokers failure to make all required disclosures. _ Pedro v. Pacific Plan of Californria, D.C.Cal.1975, 393 F.Supp. 315

Disclosure of each creditor involved in loan transaction was to be made together with all the disclosures required by pre-simplification regulation Z, on the same side of a single page or statement. Id

2 4

Trade name of corporation does not meet requirement of Truth in Lending Act, section 1601 et seq. of this title that creditor shall furnish a customer with duplicate of instrument or statements by which required disclosures are made and on which creditor is identified. Lawrence v. Franklin Inv. Co., D.C.D.C.1978, 468 F.Supp. 499

15 USC 1638  (Required Disclosure by Creditor)

(a) For each consumer credit transaction other than under an open end credit plan, the creditor shall disclose each of the following items to the extent applicable:

(1) The identity of the creditor required to make disclosure.

12 USC 2603  Uniform Settlement Statement

(a) "The Secretary, . . . shall develop and prescribe a form, . . ." "Such form shall conspicuously and clearly itemize all charges imposed . . ."

We suggest to this court that these defendant(s) have created a pattern of practice that violates every intent and purpose of the Cranston Gonzalez amendments to both TILA and RESPA, and having been warned by Qualified Letter of Complaint of their error, they never ceased any single illegal practice, but instead, used this instance as their *motive and intent* to injure and destroy McCarley.

Statute of Frauds relevant to McCarley case. (per www.floridalitigationguide.com/guide.php)

There exists a four step process to plead the existence of fraud.

(1) Defendant(s) made a false statement(s) regarding a material fact, thus, defendant fraudulently disclosed, or, fraudulently ignored condition precedent(s) of the mortgage contract; and

(2) Defendant(s) knew or should have known the representation was false, thus, defendant knew or should have known the fraudulently disclosed or ignored conditions precedent(s) as represented by defendant(s) were false; and

(3) Defendant(s) intended that the representation induce plaintiff to act on it, thus, the defendant(s) made fraudulent disclosure or ignored conditions precedent(s) with intent that plaintiff act based upon defendant(s) misrepresentation; and

(4)Plaintiff suffered damages in justifiable reliance on the representation, thus, plaintiff incurred damages in justifiable reliance on the fraudulent disclosure of conditions precedent(s) as represented by defendant.

The elements of claims for fraud in the inducement, fraud in the performance, fraudulent misrepresentation and negligent misrepresentation are identical and differ only by the underlying facts supporting each claim. *Compare* Pulte Home Corp. v. Osmose Wood Preserving, Inc., 60 F.3d 734, 742 (11th Cir. 1995)(fraud in the inducement), *with* Baggett v. Electricians Credit Union, 620 So.2d 784, 786 (Fla. 2d DCA 1993) (negligent misrepresentation), *and* Johnson v. Davis, 480 So. 2d 625, 627 (Fla. 1985)(fraudulent misrepresentation). The economic loss doctrine bars claims for fraud in the performance, but not claims for fraud in the inducement. *See* Williams v. Elec. Co., Inc., v. Honeywell Inc., 772 F.Supp 1225, 1238 (N.D.Fla. 1991). Fraud is also known as the *tort of deceit*. *See* Crown Eurocars, Inc., v. Schropp, 636 So. 2d 30, 37 (Fla. 2d DCA 1993), *aff'd,* 654 So. 2d 1158 (Fla. 1995)

12 USC §2614 notes 5&6, pleadings and fraud:

Home purchasers complaint, alleging injury as result of vendor's undisclosed referral agreement with providers of real estate settlement services, was sufficient to state cause of action for violation of Real Estate Settlement Procedures Act. Miller v. Weitzer Panache, Ltd., S.D.Fla.1990, 751 F.Supp 980

Home purchasers complaint, alleging injury as result of vendor's undisclosed referral agreement with providers of real estate settlement services, pled fraud with sufficient specificity. Miller v. Weitzer Panache, Ltd., S.D.Fla.1990, 751 F.Supp 980

In view of the above information, it is clear that McCarley is justified to invoke or apply charges predicated upon fraud statutes.

INTERRELATIONSHIP BETWEEN RESPA, DISCLOSURE, CREDITOR, SERVICER,
VIOLATIONS, UNIFORM SETTLEMENT STATEMENT, DEBTOR
(Brief in Support)

1. Many have been confused about the interplay of statutory construction between Consumer
Protection code and the concepts in the title. It is important to this case that certain "conventions"
are established in order to prevent plaintiff/defendant/Court/Judge from devoting countless hours of
research and code reproduction necessary to the successful prosecution of this case.

2. Real Estate Settlement Procedures Act establishes statutory code and procedures that
govern the entirety of the Mortgage process; from (1) initiation, (2) finance parameters, (3) closing
process of mortgage, (4) broker/title/insurance and related fees and kickbacks, (5) establishment of
conditions precedent, (6) enforcement of conditions precedent, (7) governance of monthly behavior
of creditor and/or associated servicer organization, (8) filing of legal paper associated with
conditions precedent, (9) complaint resolution process, (10) escrow process, (11) refinance as
applicable, (12) complaint process for courts, (13) conclusory process of mortgage, whether
successful or unsuccessful.

3. While most of the statutory construction of RESPA and associated CFR Regulations X
and Z are devoted to the initiation and establishment process of the mortgage transaction, the totality
of RESPA continues in effect for the total time period identified in point above. If mortgage
instrument is established for 30 years, then RESPA governs for 30 years.

4. An element of RESPA is in effect during each and every monthly billing cycle, due to the
legal importance governing the disclosure of and compliance with conditions precedent established
by the Uniform Settlement Statement established at the point of initiation of the mortgage. Should
either party violate disclosed conditions precedent, the possibility of penalty comes into play. That

27

penalty might be late fees if a consumer violation and the penalty may be §2605 penalty-damages-costs if a creditor/servicer violation such as excess charges, excess billing or excess finance charge.

5. An element of RESPA comes into play each and every time the creditor/servicer applies monies to or subtracts from Escrow.

6. An element of RESPA is in effect each and every time a creditor/servicer provides or fails to provide the statutory Escrow statement as required by law.

7. RESPA and Uniform Settlement Statement come into play each and every time a creditor attempts to sell the consumer additional products or insurance or refinance that may change the terms, fees or billing of the disclosed conditions precedent.

8. RESPA is involved at any time a creditor or servicer change identities or ownership.

9. RESPA disclosure is involved any time a merger or acquisition of creditor may occur.

10. RESPA disclosure is involved with each and every process of recording the legal paper documents required by the mortgage process or title transaction, as same must comport with the conditions precedent and disclosures provided by the contract and by the Uniform Settlement Statement or subsequent signatory documents.

11. Qualified Written Request is just and proper (per RESPA) for any incident in which a consumer believes the creditor or servicer has violated either the Uniform Settlement Statement or the terms and conditions of the mortgage contract approved by the parties.

12. RESPA Uniform Settlement Statement is invoked at any time the parties to the transaction attempt to refinance or change the conditions or terms.

13. RESPA disclosure is involved fully with any attempt by creditor to declare default or foreclosure or make attachments to title or sell or assign the mortgage to another.

14. RESPA disclosure is involved with the process of title transfer at the successful or unsuccessful conclusion of the mortgage.

15. Qualified Written Request may be initiated at any time during the period of time the mortgage is in effect.

16. RESPA continues to apply to the fullest extent of applicable statutes of limitation, including the period beyond conclusion of the transaction.

17. Qualified Written Request may be initiated up until the time of a RESPA action.

18. Once an enforcement or court action is commenced, there is no statute to prevent a party to a lawsuit from investigating and discovering any number of RESPA violations not previously complained about on a Qualified Written Request, and there is no statute to prevent same aggrieved party from bringing those additional charges in an action before the courts.

19. RESPA is involved in the propriety of payoff's and kickback's that may be involved at the closing process, along with penalties for same.

20. Creditor/servicer is expected to audit and trap his possible billing, disclosure, or other errors at any and all times up to and including the time of initiation of an action.

Disclosure Fraud at Inception of Mortgage
Fraud in Legal Paper Throughout Mortgage

1. Mortgage was originated by Mortgage broker d.b.a. Homesense Financial Services (Homesense), having Vestavia Hills address. They immediately sold McCarley mortgage to Household Financial Services and six months later had ceased all business activity. Homesense appeared to be a credible organization – were properly registered with the Alabama Secretary of State and the Alabama State Banking Authority.

2. It was not until plaintiff investigation following foreclosure that we learned of the "fly by night" nature of this organization. We invoke by reference exhibits 26, 27, 28 on Doc. # 19 as the first step in identifying the legal problems created by Homesense. The appendix also includes a recital of the 12 CFR Regulation X and Z requirements of law that exist for the creditor to notify the debtor of any changes in status of the creditor and Homesense fully fails all those statutes found in 12 CFR §§ 226.5, 26.9, 226.17.

3. Plaintiff charges that:

(1) Homesense made a false statement(s) regarding a material fact, thus, defendant fraudulently or failed to disclose, or, fraudulently ignored the requirement to report changing conditions or other condition precedent(s) of the mortgage contract; and

(2) Homesense knew or should have known the representation was false, thus, defendant knew or should have known the fraudulently disclosed or ignored conditions precedent(s) as represented by defendant(s) were false as a direct result of their having filed a proper CHANGE OF SERVICER disclosure; and

(3) Homesense intended that the representation induce plaintiff to act on it, thus, the defendant(s) made fraudulent disclosure or ignored conditions precedent(s) with intent that plaintiff act based upon defendant(s) misrepresentation; and

(4) Plaintiff suffered damages in justifiable reliance on the representation, thus, plaintiff incurred damages in justifiable reliance on the fraudulent disclosure of conditions precedent(s) as represented by defendant.

3. Homesense then makes matters far worse by dropping out of sight in some sort of

continual merger of companies documented by the South Carolina Secretary of State.

4. Homesense created an immediate RESPA disclosure violation by

a) failing to notify debtor of changing conditions of the mergers as required by Regulation Z.
b) registering a deed, mortgage, and title in the false name of a nonexistent corporation.
c) initiating the fraudulent ASSIGNMENT OF SECURITY INSTRUMENT (now officially authenticated for evidence purposes and submitted with this package) on the very same day the mortgage is initiated.
d) ASSIGNMENT OF SECURITY INSTRUMENT was signed and notarized by what appears to be the requisite people on the very day of initiation of mortgage, which leads to the inescapable conclusion that plaintiff was targeted for foreclosure on the very day of mortgage initiation.
e) Instrument above was not registered by Randolph County Probate Judge for more than two years beyond the date it was signed and notarized.
f) Plaintiff was not notified of the existence of the document above.
g) Homesense never recorded the fact they had sold the mortgage to any other organization.
h) Homesense remained the "owner of record in Randolph County Probate Office.
i) Homesense never recorded the fact they had sold the right to McCarley mortgage
j) Defendant(s) became servicer and took McCarley payments for 30 months, all of which time, the registered owner was defunct and out of business.
k) Plaintiff must learn to whom servicer forwarded proceeds of McCarley payments
l) It appears a point of fraud that defendant(s) would continue to take McCarley money while there was no officially recorded owner of the mortgage, title, or property

5. Household Financial Services (HFS), a predecessor of defendant(s) became the disclosed

servicer of the mortgage in June 2000 and never recorded their presence in the Randolph County

Probate Office, although once claiming to be owner of mortgage, Doc #19, ex 54, page 2.

m) HFS converted to Household Finance Corporation (HFC) during the mortgage.
n) HFC declared themselves "in control" on the ASSIGNMENT OF SECURITY INSTRUMENT, via their act of naming Mortgage Electronic Registration Systems the assignee.
o) HFC never officially or properly recorded any legal paper whatsoever throughout this mortgage tenure, as is clearly required by 12 CFR Regulation Z. and also by RESPA.

6. This total failure to legally disclose, as required by statutes identified herein, along with

the total failure to properly and legally record the necessary legal documents with the Randolph

County Judge of Probate, should make clear that no binding conditions of mortgage ever existed, and

that the subsequent mortgage foreclosure is due to be overturned.

31

7. Every point outlined herein is a violation of the disclosure process demanded by RESPA, and penalty provisions are due to be enacted to the redress of McCarley injuries.

8. Best example of the intent of Congress as regards this fortiori of disclosure failure is:

12 CFR 226.9  Subsequent disclosure requirements

> Whenever any term required to be disclosed under 12 CFR 226.6 is changed or the required minimum periodic payment is increased, the creditor shall mail or deliver written notice of the change to each consumer who may be affected. The notice must be mailed at least 15 days prior to the charge.

> Note 3   Identification of Creditor

> Where no approximation nor any explanation of absence of lenders identity from disclosure statements provided to borrower by mortgage loan broker was even attempted, . . . did not excuse brokers failure to make all required disclosures. Pedro v. Pacific Plan of California, D.C.Cal. 1975, F.Supp. 315.

> Disclosure of each creditor involved in loan transaction was to be made together with all the disclosures required by pre-simplification Regulation Z, on the same side of a single page of statement. Id.

These opinions seem to uphold McCarley allegations of fraud in disclosure.

Misapplication of Major Payments

1. (a) Throughout the mortgage, defendant(s) continued to misapply payments. (b) There are instances in which entire payments are misapplied. (c) There are instances in which single checks covering several payments are misapplied to a point making it difficult to trace and reconcile said payments. (d) There are many instances in which plaintiff checking account statement that indicates checks paid to defendant(s) cannot then be matched to the actual billing summary found in Doc #19, exhibit 37, 38.

2. Greatest violation of payment misapplication, in violation of all RESPA disclosure statutes, is represented by Doc #19 ex 37, 38, and Exhibit 55, a plaintiff bank statement. Ex 55 makes it clear that defendant electronically debited McCarley bank account for an amount equal to 4 monthly payments in one single 5 day period. Plaintiff never authorized defendant to utilize electronic debit on a regular basis. In this example, plaintiff opened the monthly bank statement to find several hundred dollars in bounced check charges, along with this act of theft and disclosure violation. Defendant did made this correction, however, defendant NEVER REPAID THE $400 IN BOUNCED CHECK CHARGES. Also, defendant has never until this day provided a Billing Summary Statement that documents this instance. This is clearly an act of theft and another in a line of instances demonstrating the MOTIVE AND INTENT of this defendant to defraud, slander, and ruin plaintiff.

3. Plaintiff final payment to defendant was in the range of $1000. Plaintiff was in process of heated discussion with account representatives of defendant and this amount was to pay account fully to end of 2002. Upon receiving statement, plaintiff noted they only credited plaintiff account through October 2002. Plaintiff now knows the balance was placed in an illegal escrow account and never reported, as required by 12 USC 2609. The $1000 amount never appears on the billing

summary.  We question whether this is an act of theft or another act of fraud or not so simple misapplication.

4.  We will prove at trial that payments were made that were never posted to the official billing summary account.  Defendant has remained silent on this charge for over 3 years.

5.  Plaintiff charges that:

 (1) Defendant(s) continued to make false application of payments in order to make McCarley billing record appear a, thus, defendant fraudulently disclosed, or, fraudulently stated or accounted for condition precedent(s) of the mortgage contract; and

(2) Defendant(s) knew or should have known the representation was false, thus, defendant knew or should have known the fraudulently disclosed or stated conditions precedent(s) as represented by defendant(s) were false; and defendant status as a $72 billion corporation indicates they have the requisite accounting skills to know better; and

(3) Defendant(s) intended that the representation induce the courts to act on it, thus, the defendant(s) made fraudulent disclosure of monetary accounts or misrepresented conditions precedent(s) with intent that the courts act based upon defendant(s) misrepresentation, this was a continuing element of defendant attempt to violate case precedent in 17 AmJur §§701,702,702,716 and force the conditions leading to breach of contract; and

(4)Plaintiff suffered damages as a direct result of defendant(s) representation, thus, plaintiff incurred damages as a direct result of the fraudulent disclosure and submittal of accounting and legal instruments and of conditions precedent(s) as represented by defendant.

6.  We charge that there has been such a total defendant(s) failure of specific performance; to account for or to disclose even the basic monthly payments along with such total failure to legally record titles, deeds, mortgages, necessary legal instruments, that no condition of mortgage could possibly exist and this foreclosure is bound to be overturned.

34

MONTHLY DISCLOSURE AND ESCROW VIOLATIONS

      1.  The Creditor/servicer is required by RESPA to abide by the Uniform Settlement Statement and the disclosed conditions precedent in the form of payments and fees, throughout the life of the mortgage unless by written instrument to the contrary. Simplest instrument of evidence of this condition and the failure of defendant(s) is the Monthly Billing Summary of the total mortgage transaction (Doc # 19, exhibits 37, 38). Header of page one provides a recital of the terms, although some information contained in the header was never disclosed.

      2.  The monthly violations of disclosed terms and billing represent an extreme weight of evidence demonstrating over 77 total violations in last 15 months alone..

a) It was almost rare that the correct monthly billing was actually charged to McCarley, thus any amount different than the billing terms agreed were in violation of RESPA.
b) Escrow was forbidden by the McCarley mortgage contract, although defendant(s) applied money to escrow whenever they chose, and thus in violation of RESPA
c) Additionally, the monthly bill stubs provided to plaintiff were constantly in violation of disclosure, as demonstrated by Doc #19, exhibits 45, 47, 48, 49, 50.
d) In support of above is Doc # 19, exhibit 55 bank statement indicating 4 months payments were electronically debited to McCarley account in one single month, without authorization. (Bank fired) This action is not presently traceable to the monthly billing statement.
e) defendant(s) have not as yet provided a total statement for the 30 months of the mortgage. Plaintiff only has this evidence for the final 15 months.

3. Plaintiff charges that:

(1) Defendant(s) made a false disclosure(s) regarding a material fact(s) of monthly payment or escrow charges, thus, defendant fraudulently disclosed, or, fraudulently ignored condition precedent(s) of the mortgage contract; and

(2) Defendant(s) knew or should have known the representation was false, thus, defendant knew or should have known the fraudulently disclosed or ignored conditions precedent(s) as represented by defendant(s) were false, and they should have known by virtue of the practice gained by a $72 billion mortgage granting institution; and

(3) Defendant(s) intended that the representation induce plaintiff to act on it, thus, the defendant(s) made fraudulent disclosure or ignored conditions precedent(s) with intent that plaintiff act based upon defendant(s) misrepresentation; and

(4)Plaintiff suffered damages in justifiable reliance on the representation, thus, plaintiff incurred damages in justifiable reliance on the fraudulent disclosure of conditions precedent(s) as represented by defendant.

4. This total failure to legally abide by disclose, as required by statutes identified herein, along with the total failure to properly and legally record the necessary legal documents with the Randolph County Judge of Probate, should make clear that no binding conditions of mortgage ever existed, and that the subsequent mortgage foreclosure is due to be overturned.

5. Every point outlined herein is a violation of the disclosure process demanded by RESPA, and penalty provisions are due to be enacted to the redress of McCarley injuries.

6. **Define Key Parameters and Conditions Precedent related to Bank disclosure violations**

Exhibit entitled THE MORTGAGE identifies just a few key conditions that are required to be disclosed in literally all mortgages of any type. Violation of disclosure of these conditions lead to the fines identified herein.

Key Conditions violated:

| | |
|---|---|
| The Name of the Lender | over 43 identities used and never disclosed |
| Contact Person at the Lender and/or Servicer | never provided |
| Contact Telephone for contact person | McCarley never able to make contact |
| Payment Amount | Disclosed but never followed |
| Late payment Fee | Disclosed but changed at will |
| Escrow | Forbidden by mortgage, although utilized |

Any dollar amount charged over and above the Payment and the Late Fee must be written into the Mortgage contract or else be disclosed prominently as a regular charge and displayed on the billing statement. Otherwise, if the monthly amount charged differs from the Payment Amount or Payment plus late fee; a violation of both TILA and RESPA is present. We will provide documentary evidence to prove the Bank had a practice of charging amounts never disclosed in any document.

36

The Mortgage of McCarley specifically excluded Escrow accounts and/or amounts. Therefore, any imposition of escrow charges violates TILA and RESPA.

**7.    Monthly ongoing servicer violations of disclosure, billing and practice violations**

A review of the Billing Summary, marked as Exhibit APPENIX B will reveal the numbers of violations perpetrated by these banks. However, the banks even got the billing statement wrong. They failed to provide a statement for the first 16 months of the mortgage.

For simplicity, violations have been circled on Billing Statement Exhibit.

(A). In the header of this 3 page document we find the following violations:
   a. Name                         (different than disclosed – they used 43 different identities)
   b. Ancillary amount – (not disclosed in mortgage contract)
   c. Total Payment
   d. Paid to date
   e. fees        – (not disclosed in mortgage contract)

A total of 5 violations of 12 USC 2605 are contained in the header of the document.

(B). Within the body of the billing statement, which seems intended to track monthly payment information, we find the following violations.

   f. Total Amount Column shows 40 violations of disclosure of 12 USC 2605

   g. Escrow column shows 11 violations of disclosure of 12 USC 2605

   h. Fees column shows 14 violations of disclosure of 12 USC 2605

**8. Monthly Billing violations**

Evidence in presented by Exhibit BILLING MONTHLY. These pieces of evidence provide a strong look at the inside of HFC and the joke accounting standards used by this bank.

The header in each case, indicates they have billed the correct monthly amount. Then, upon looking further down the statement, we find many violations. The stub the consumer is to remit with his

check actually totals all the data incorrectly. They include the total amounts paid in with the actual

monthly payment, along with other nonsensical amounts never disclosed anywhere. The result is a

billing for several hundred dollars, whereas McCarley only owed the normal monthly payment.

### 9. Disclosure Billing Violations and Accountability Errors on Detail Review of 02/08/01

(a) Header charges a Late Fee never disclosed and therefore a disclosure violation.
(b) Bank electronic debited McCarley checking account for 4 months payments without
authorization during this month.
(c) Two payments are reflected being reversed – why not 4
(d) Footer violations on slip designed to be returned with payment

| | 02/08/01(exhibit bill 2) | 02/14/01 (exhibit bill 3) |
|---|---|---|
| November Payment | 290.51 | 290.51 (correct disclosed payment amount) |
| Previous Payments | 1162.04 | 581.02 (adding in what already paid ????) |
| Unpaid Late Charges | 43.59 | 4.61 (nondisclosed, illegal late fees) |
| Other Fees | 27.00 | 27.00 (nondisclosed, illegal fees) |
| Total Due | 1523.14 | 903.14 (no way this is accurate. Who audits?????) |

Next, we note a late fee in the footer --not the same as the fee disclosed in the mortgage contract.

McCarley called HFC and complained of this illegal behavior on a regular basis. They would claim

to fix the problem, and then the same problems were still there the very next month. Of great

interest is the fact that these illegal charges cannot be traced to the billing summary. Therefore we

have evidence of yet further disclosure violations.

### Statutory Penalties invoked in each instance

12 USC 2605 statutory penalty is $1000 for each instance, plus damages and costs

SEE REGULATION Z Brief in Support for additional statutes and case citations regarding these

many disclosure violations.

DEFAULT FRAUD AND RELATED DISCLOSURE VIOLATION

1. Two exhibits required to follow this brief in support are the (i) Assignment of Security Instrument at Doc # 19, exhibit; and (2) Billing Summary at Doc #19, exhibit 37, 38.

2. As discussed in other submittals, this issue is perhaps the largest of many smoking guns in this case. Defendant(s) declared McCarley in default on the very day their own Billing Summary Statement declares McCarley is overpaid by $190.00.

3. This issue is discussed also in DISCLOSURE FRAUD AT INCEPTION Brief in Support. ASSIGNMENT OF SECURITY INSTRUMENT contains the following evidence of fraud and failure to disclose:

a) Document initiated, signed, notarized on day of mortgage initiation, May 2000
b) Not officially recorded until July 2002
c) Originator went out of business without passing title or mortgage to another.
d) Defendant(s) simply declared themselves owner with no authorization in any form from initiator
e) Defendant(s) declared owner by virtue of a rubber stamp and notarization
f) No legal paper exists to prove defendant(s) legally acquired rights to McCarley mortgage
g) With no legal paper proof of ownership, defendant(s) declared another corporation Assignee

4. And now in consideration of the above, the Billing Summary makes it clear that McCarley was overpaid by $190.00 on the day this default was declared and an assignee named.

5. Defendants also forwarded negative credit information to the credit reporting agencies at this time. Plaintiff holds proof that a third party actually utilized this negative information against him, as required by citation (document being authenticated) Johnstone v. Bank of America, N.A., N.D.Ill.2001, 173 F.Supp2d 809. Thus the negative credit information was actually used to injure and damage McCarley by preventing his ability to secure professional employment of the type he has enjoyed for 30 years. In fact, McCarley has distributed so many resume's since the illegal act of false default and subsequent false credit information, that McCarley may never again find professional employment in his chosen or any other field.

Furthermore, other courts in this district have held that a consumer is not injured by an inaccurate credit report unless that false information **817** is communicated to and used by a third party. See, e.g. Renninger, 1998 WL 29547 at **6**.

6. Plaintiff charges that:

(1) Defendant(s) made a false statements and reports(s) regarding a material fact, thus, defendant fraudulently disclosed, or, fraudulently stated condition precedent(s) of the mortgage contract; and

(2) Defendant(s) knew or should have known the representation was false, thus, defendant knew or should have known the fraudulently disclosed or stated conditions precedent(s) as represented by defendant(s) were false, they knew plaintiff was watching closely due to the letters to Alabama Attorney General and defendant(s), and their status as the most litigated bank in existence served to provide them plenty of training in these issues; and

(3) Defendant(s) intended that the representation induce third parties to act on it, thus, the defendant(s) made fraudulent disclosure or misrepresented conditions precedent(s) with intent that third parties act based upon defendant(s) misrepresentation; and

(4)Plaintiff suffered damages as a direct result of defendant(s) representation, thus, plaintiff incurred damages as a direct result of the fraudulent disclosure of conditions precedent(s) as represented by defendant.

7. This issue is the single most damaging violation in this litany. In the shrinking world of corporate executives we are faced with a statistic that 80% of employers conduct extensive background checks on potential employees as well as those in line for significant promotion. Such negative credit information will fully prevent McCarley from finding professional employment.

8. HFC III illegal act has caused a total stoppage of the otherwise brilliant career of George D. McCarley. An accomplished Bankruptcy and Turnaround Management professional, McCarley has not worked since the illegal default declaration. Understand that such a professional lifestyle requires a liberal credit line in order to negotiate extreme travel expenses. Diners Club actually canceled McCarley charge card upon noting HFC III intent on credit bureau statements.

9. Today's professional is under greater scrutiny than ever before. McCarley ability to earn key bankruptcy and turnaround contracts requires a personal background review that is perhaps more

40

stringent than a National Security Credential Review. The illegal black mark placed against

McCarley by HFC III has effectively ended a McCarley career that was surely bound for selection as

CEO or Board member of a major corporation – a fact backed by evidence of such correspondence.

    10. The Courts review of MOTIVE INTENT OPPORTUNITY brief in support will also

reveal the defendant(s) had in effect, a plan to force plaintiff into a state of default.

a) plaintiff constantly talked and complained to defendant account reps by telephone.
b) various account problems were constantly under review, from incorrect billing to improper
late fees, to fees for services never rendered,
c) even the illegal default declaration of July 2002 was discussed by telephone and plaintiff
believed the situation had been proven false and rectified properly.
d) in fact, the illegal default was never vacated.
e) the ultimate plan of defendant to force[20] default was now in place via the illegal default of
July 2002. That instrument served to quash any further professional work opportunities for
plaintiff
f) although any and all professional income was destroyed by the illegal default, plaintiff
continued to make payments
g) because plaintiff continued to make payments, defendant(s) exercised the final tool of filing
illegal legal instruments, as will be proven in court.

    11.. Best example of the intent of Congress as regards this fortiori of disclosure failure is:

12 CFR 226.9  Subsequent disclosure requirements

> Whenever any term required to be disclosed under 12 CFR 226.6 is changed or the
> required minimum periodic payment is increased, the creditor shall mail or deliver
> written notice of the change to each consumer who may be affected. The notice must
> be mailed at least 15 days prior to the charge.

> Note 3  Identification of Creditor

> Where no approximation nor any explanation of absence of lenders identity from
> disclosure statements provided to borrower by mortgage loan broker was even
> attempted, . . . did not excuse brokers failure to make all required disclosures. Pedro
> v. Pacific Plan of California, D.C.Cal. 1975, F.Supp. 315.

> Disclosure of each creditor involved in loan transaction was to be made together with
> all the disclosures required by pre-simplification Regulation Z, on the same side of a
> single page of statement. Id.

These opinions seem to uphold McCarley allegations of fraud in disclosure.

---

[20] See 17 AmJur case citations from Doc 5, page 40, 41 indicating court decisions against this practice.

12. We charge that there has been such a total defendant(s) failure to disclose even the basic identity of defendant, along with proof that defendant forced or attempted to force plaintiff performance failure, along with such total defendant failure to legally record titles, deeds, mortgages, necessary legal instruments, that no condition of mortgage could possibly exist and this foreclosure is bound to be overturned.

Qualified Letter of Complaint Failure by Defendant(s)

        1. McCarley initiated a series of Qualified Letters of complaint to defendant(s) on January 15, 2001. He had been attempting to change the mortgage so that he had more than 65% of the value of the property covered by mortgage. This process began in July 2000. The problem was, HFS was unable to locate the McCarley mortgage on their computer for the next two months, thus the first HFC III violation of disclosure requirements. Obviously the mortgage company is required to keep adequate records to service an account. Most notably, McCarley charges this is the first instance of HFC III violation of 12 USC §2605—Servicing of Mortgage Loans and Escrow Accounts. Statute 2605 and Ala. § 5-19-19 allows banks and credit institutions 60 days to correct their errors, during which time no late fee may be charged. McCarley charges that HFC III violates §2605 on both counts, with each suggestion or billing of late fee, thus injuring McCarley in process. McCarley ultimately involved the Alabama Attorney General Office of Consumer Affairs. Correspondence with Barbara Armstrong at that office serves as evidence of the several months required for HFS to successfully locate the McCarley mortgage on their computer with consistency.

        2. The process of Qualified written requests went to four letters exchanged between McCarley, Alabama Attorney General and defendant. Defendant never properly rectified the problem, and therefore a violation of RESPA. In attempting to solve the problem, they offered to refinance the McCarley mortgage with an interest rate 5 percent higher, and upon payment of several thousand dollars. Thus the claim of Homesense that the new bank would be happy to change the conditions so early in the mortgage was a failed claim that McCarley had relied upon.

        3. The letters would continue for some 4 months, obviously violating the 60 day requirement for resolution of complaints.

4. In closing the letters, the Alabama Attorney General Office of Consumer Affairs advised

that McCarley retain a lawyer, as the AG had been unable to mitigate the problem, see Doc #19 at

exhibit 53.

5. Plaintiff charges that:

(1) Defendant(s) made a false disclosure(s) in claiming they would be happy to refinance, thus, defendant fraudulently disclosed, or, fraudulently ignored condition precedent(s) of the mortgage contract; and

(2) Defendant(s) knew or should have known the representation was false, thus, defendant knew or should have known the fraudulently disclosed or ignored conditions precedent(s) as represented by defendant(s) were false; and

(3) Defendant(s) intended that the representation induce plaintiff to act on it, thus, the defendant(s) made fraudulent disclosure or ignored conditions precedent(s) with intent that plaintiff act based upon defendant(s) misrepresentation; and

(4)Plaintiff suffered damages in justifiable reliance on the representation, thus, plaintiff incurred damages in justifiable reliance on the fraudulent disclosure of conditions precedent(s) as represented by defendant.

IDENTITY FRAUD, DISCLOSURE VIOLATIONS

1. We have provided several briefs in support that indicate totality of disclosure required by

RESPA. Chief among that disclosure demand is the name and identity of the creditor.

2. We have indicated that the Mortgage Broker initiating the mortgage quickly merged with

up to 28 other companies, some within a week of the mortgage initiation. See Doc 19, ex 26,27,28.

None of the mergers were disclosed as required by RESPA or Regulation Z.

3. We have provided in Doc 19, pages 27 to 29, a listing of 43 distinct identities used by

defendant(s) during the 30 month tenure of mortgage, and none of the identities was disclosed.

4. We have provided information in brief in support DISCLOSURE FRAUD AT

INCEPTION that defendant(s) never legally recorded any of the title's or mortgage's expected and

required by Alabama Law.

5. Plaintiff charges that:

(1) Defendant(s) made many false statements in regard to their identity, thus, defendant
fraudulently disclosed, or, fraudulently stated condition precedent(s) of the mortgage
contract; and

(2) Defendant(s) knew or should have known the representation was false, thus, defendant
knew or should have known the fraudulently disclosed or stated conditions precedent(s) as
represented by defendant(s) were false, and they should have known it was false as a direct
result of the practice they have gained from such constant merger and acquisition activity
which the legal requirement to disclose changing conditions; and

(3) Defendant(s) intended that the representation induce plaintiff to act on it, thus, the
defendant(s) made fraudulent disclosure or misrepresented conditions precedent(s) with
intent that plaintiff act based upon defendant(s) misrepresentation; and

(4)Plaintiff suffered damages as a direct result of defendant(s) representation, thus, plaintiff
incurred damages as a direct result of the fraudulent disclosure of defendant(s) identity and other
conditions precedent(s) as represented by defendant.

6. We charge that there has been such a total failure to disclose even the basic identity of

defendant that no condition of mortgage could exist and this foreclosure is bound to be overturned.

45

FRAUD AT FORECLOSURE BY HOMESENSE AND DEFENDANT(S)

1. Homesense was the only creditor of record in the mortgage transaction. We urge the court to recall that as many as 71 different corporate entities are involved in the total procedure in the span of just 30 months.

2. Homesense ceased to exist in May 2000 and no other creditor would ever register a deed, mortgage, title, or other legal instrument with the Randolph Probate Judge.

3. Homesense had been out of business two years before defendant(s) fraudulently claimed to have status to make assignment, although defendant(s) were never in evidence and never registered any legal paper whatsoever.

4. All money paid beyond the mortgage transaction closing was paid to defendant(s), at a time when the mortgage creditor had ceased to exist.

5. Monies were paid to entities never in evidence in the official point of recordation of such transactions, the Judge of Probate of Randolph county, thus raising questions of fraud.

6. The assignee who processed foreclosure, was named assignee by an entity never in evidence and never registered in the Probate office in any form or fashion, thus illegal.

7. Foreclosure was executed in the name of entities and defendant(s) either out of business or never in evidence at the Office of Probate Judge of Randolph County.

8. We charge defendant(s) have now committed the ultimate disclosure fraud via their failure to record their position in relation to the McCarley mortgage.

9. Plaintiff charges that:

 (1) Defendant(s) submitted false identity disclosure and false legal instruments to the courts regarding a material fact, thus, defendant fraudulently disclosed, or, fraudulently stated condition precedent(s) of the mortgage contract; and

(2) Defendant(s) knew or should have known the representation was false, thus, defendant knew or should have known the fraudulently disclosed or stated conditions precedent(s) as

represented by defendant(s) were false, that Homesense did in fact provide the first proper NOTICE OF CHANGE OF SERVICER and this indicates defendant(s) were aware of proper legal steps in this process; and

(3) Defendant(s) intended that the representation induce the courts to act on it, thus, the defendant(s) made fraudulent disclosure or misrepresented conditions precedent(s) with intent that the courts act based upon defendant(s) misrepresentation; and

(4)Plaintiff suffered damages as a direct result of defendant(s) representation, thus, plaintiff incurred damages as a direct result of the fraudulent disclosure and submittal of legal instruments and of conditions precedent(s) as represented by defendant.

10. The Courts review of MOTIVE INTENT OPPORTUNITY brief in support will also

reveal the defendant(s) had in effect, a plan to force plaintiff into a state of default.

a) plaintiff constantly talked and complained to defendant account reps by telephone.
b) various account problems were constantly under review, from incorrect billing to improper late fees, to fees for services never rendered,
c) even the illegal default declaration of July 2002 was discussed by telephone and plaintiff believed the situation had been proven false and rectified properly.
d) in fact, the illegal default was never vacated.
e) the ultimate plan of defendant to force[21] default was now in place via the illegal default of July 2002. That instrument served to quash any further professional work opportunities for plaintiff
f) although any and all professional income was destroyed by the illegal default, plaintiff continued to make payments
g) because plaintiff continued to make payments, defendant(s) exercised the final tool of filing illegal legal instruments, as will be proven in court.

11. We charge that there has been such a total defendant(s) failure to disclose even the basic

identity of defendant, along with proof that defendant forced or attempted to force plaintiff

performance failure, along with such total defendant failure to legally record titles, deeds, mortgages,

necessary legal instruments, that no condition of mortgage could possibly exist and this foreclosure

is bound to be overturned, as indicated by the following:

"In view of the determination that lender violated this subchapter by failing to disclose terms in its statement of disclosure fairly and conspicuously and in meaningful sequence, further proceedings were not necessary with respect to borrowers contention that they were entitled to summary judgment on claim that

---

[21] See 17 AmJur case citations from Doc 5, page 40, 41 indicating court decisions against this practice.

lender violated this subchapter by failing to disclose . . . "  <u>Conrad v. Beneficial Finance Co. of New York Inc</u>., 1977, 394 NYS2d 923.

.

12.  Best example of the intent of Congress as regards this fortiori of disclosure failure

leading to fraudulent foreclosure is:

12 CFR 226.9  Subsequent disclosure requirements

Whenever any term required to be disclosed under 12 CFR 226.6 is changed or the required minimum periodic payment is increased, the creditor shall mail or deliver written notice of the change to each consumer who may be affected. The notice must be mailed at least 15 days prior to the charge.

Note 3   Identification of Creditor

Where no approximation nor any explanation of absence of lenders identity from disclosure statements provided to borrower by mortgage loan broker was even attempted, . . . did not excuse brokers failure to make all required disclosures. <u>Pedro v. Pacific Plan of California</u>, D.C.Cal. 1975, F.Supp. 315.

Disclosure of each creditor involved in loan transaction was to be made together with all the disclosures required by pre-simplification Regulation Z, on the same side of a single page of statement.  <u>Id.</u>

These opinions seem to uphold McCarley allegations of fraud in disclosure.

**ADDENDUM**

Limited Brief of Case Citations in support of BREACH OF
CONTRACT by Defendant.   Footnote numbers correspond to 17
American Jurisprudence 2d.

### Statute 701 Generally

A party may not insist upon performance of a contract where he has brought about its breach.
(91) A plaintiff cannot prevail in an action for nonperformance of a contract if he alone is
responsible for nonperformance (92) . . .This is upon the principle that he who prevents a
thing may not avail himself of nonperformance which he has occasioned. (93) A fortiori, a
total breach by obligor on a contract excuses the obligee from the duty of further
performance. (94)

Footnotes to Statute 701
(91) Reimann v. Saturday Evening Post Co. (SDNY) 464 F Supp 214
Fitzgibbons Boiler Co. v National City Bank, 287 NY 326, 39 NE2d 897, reh den 287
NY 843, 41 NE2d 169
(92) Porto Rico v Title Guaranty & Surety Co., 227 US 382, 82 L.Ed 561, 33 S Ct 362
Lovell v St Louis mutual Life insurance co., 111 US 264, 28 L. Ed 423, 4 S. Ct. 390
United States v. Peck, 102 US 64, 26 L. Ed 46

A provision in a contract forbidding its modification or change "except by entry thereon in
writing signed by both parties", coupled with a provision that no court should relieve the
plaintiff from a failure to comply strictly and literally with the contract, cannot be applied
where the efficient cause of his failure to comply strictly and literally with the contract was
the conduct of the other party. Cheney v. Libby, 134 US 68, 33 L. Ed 818, 10 S. Ct 498

A promisor is discharged from all liability when the nonperformance of his obligation is
caused by the act of the other contacting party. Clearwater v. Meredith, 68 US 25, 17 L.
Ed 604

(93) Carnegie Steel v. United States, 240 US 156, 60 L. Ed 576, 36 S.Ct 342
Mogul logging v Smith Livesey Wright Co., 185 Wash 509, 55 P2d1061
(94) Melodies Inc. v Mirabile, (3d Dept) 7 App Div 2d 783

### PRACTICE GUIDE

In a case tied before a jury, alleged impossibility of performance caused by acts or conduct
of the other party is ordinarily for the jury to determine under all of the proved facts and
circumstances. (96) It is also the rule that a party may not insist upon performance of a
contract or a provision thereof where he himself is guilty of a material or substantial breach
of that contract or provision (97)   The party first committing a substantial breach of a

49

contract cannot maintain an action against the other party for subsequent failure to perform if the promises are dependent (98)

Footnotes to Practice Guide
(96) Turner v Turner, 186 Ga. 223, 197 SE 771, 116 ALR 1396.
(97) Matheney v. McClain, 248 Miss 842, 161 So 2d 516

Courts should not enforce an agreement where the party seeking enforcement has failed to perform his part. Gray v Reynolds (Ala) 553 So 2d 79; Smith v Clark (Ala) 341 So 2d 720

(98) Statute 621 Effect of First Breach  17A Am Jur 2d

## 702 Prevention of Performance Generally

It is an implied condition of every contract that one party will not prevent performance by the other party (5)  and it follows that a contracting party that prevents ... performance of other party ... cannot urge or avail himself of the nonperformance which he himself has brought about (6)  Stated differently, nonperformance of a promise in accordance with its terms is excused if performance is prevented by the conduct of the adverse party (7)

Footnotes to statute 702
(5) see statute 380
(6) Bank of Columbia v Hagner, 26 US 455, 7 L. Ed 219; List & Son v Chase, 80Ohio St. 42, 88 NE 120

One party cannot be permitted to plead his own act or fault which has prevented the performance of a contract by the other party in order to defeat the latter's recovery thereon. Whitlock v Auburn Lumber Co., 145 NC 120, 58 SE 909

A party who prevents performance on his part or on the part of the adverse party cannot take advantage of nonperformance. Suter v. Farmers Fertilizer Co., 100 Ohio St. 403, 126 NE 304

### Forms  instructions to Jury
Prevention of performance. 7 Am Jur Pl & Pr Forms    Contracts Form 48

(7) United States v Gleason, 175 US 588, 44 L. Ed 284
Denson v Provident Mutual Life Ins. Co., 231 Ala 574, 166 So 33

. . . a general rule that prevention of performance by one party . . .will excuse nonperformance by the other party. Knowles v Henderson, 156 Fla 31, 22 So 2d 384, 169 ALR 600

50

When performance of a contract is made impossible by one of the parties the other party is excused from further performance. Old Ladies Home Ass'n v Hall, 212 Miss 67, 52 So 2d 650

Conduct of a party to contract which frustrates and prevents performance by the other party excuses performance by the latter. Brenner v. Schreck, 17 Misc 2d 945, 192 NYS2d 461

## 703  Preventing performance, or causing nonperformance of conditions

One who prevents or makes impossible the performance or happening of a condition precedent . . . cannot avail himself of nonperformance. (10)

Footnotes to statute 703
(10) Lovell v St. Louis Mutual Life Ins. Co., 111 US 264, 28 L. Ed 423
Williams v. Bank of the United States, 27 US 96, 7 L. Ed 360
Realty Acceptance Corp. V. Montgomery, (CA3 Del) 51 F2d 636
Pacific Venture Corp v Huey, 15 Cal 2d 711, 104 P2d 641
Hanover Realty Corp v. Codomo, (Fla) 95 So 2d 420
Ramsey v. Brooke County Bldg and loan Ass'n., 102 W.Va 119, 135 SE 249, 49 ALR 668

The party who demanded a condition precedent cannot hinder, delay, nor prevent its happening for purpose of avoiding performance of contract. Wallerius v Hare, 194 Kan 408, 399P2d 543

The law contemplates fair dealing between parties to a contract and a party who prevents his adversary from performing a condition may not rely on such failure to excuse his own nonperformance. Heyliger v Tune-Time Fashions, Inc, (1st Dept) 39 App Div 2d 698,

## 716 Breach Generally

. . .or as an alternative remedy, he may stand upon the contract and sue either for specific performance (9), or for damages against other party (10). Damages are recoverable where a party fails or refuses to deliver property in accordance with the terms of the contract(12). In an exchange transaction, the usual remedy for breach . . . is by an action for damages(16). The party defrauded, however, is not obliged to consider the fraudulent contract as void, but may, at his option, maintain an action of deceit or special assumpsit and recover damages(19). It has been held that where there has been a breach by one of the parties, the other, after a recission and demand for the return of the property, . . . may enter against protest . . . to retake without incurring liability for trespass (22).

Footnotes to statutes 716
(9) See Specific Performance, (1st ed statute 116)
(10) Hunter v. McKenzie 197 Cal 176, 239 P 1090
(12) Plumme v. Rigdon, 78 Ill 222;  Brasher v Davidson, 31 Tex 190

*51*

(16) Mason v Bohannon, 79 Ark 435, 96 SW 181
(19) Kimball v Cunningham, 4 Mass 502
(22)  Smith v Hale, 158 Mass 178, 33 NE 493

*Definition*:  "breach" as applied to contracts, is defined as failure without legal excuse to perform any promise which forms a whole or a part of a contract, including refusal of a party to recognize the existence of the contract or the doing of something inconsistent with its existence. (88)

(88)  National City Bank v. Erskine &Sons, Inc., 158 Ohio St. 450, 49 Ohio Ops 395, 110 NE2d 598
An unjustified failure to perform  ... . is a breach  Davenport Osteopathic Hospital Asso v Hospital Service, Inc., 261 Iowa 247, 154 NW2d 153

52

Damages, Brief in support

Damage to 4 generations of family reputation in Randolph County

    1.   The extended McCarley family was pivotal in the colonization, settlement and development of Randolph County, Alabama. We are first documented in the county as a member of the Andrew Jackson military force fighting the native Indians at Horsehoe Bend. The two family branches with Jackson came back to Randolph shortly after the Indian wars.

    2. Those two family branches were Doctors and farmers. They accumulated sufficient land that before, George Wallace, they had donated land to the county on which sit fully half the school facilities in our county. They also donated the 100 acres that housed the newest school facility for 40 years. A facility never occupied for school purposes as a result of Wallace "stand in the schoolhouse door."

    3. Randolph County Courthouse, Jail, and County works facilities occupy land donated by plaintiff extended family.

    4. Several churches occupy donated land of plaintiff extended family.

    5. Perhaps those donations were too prolific and thus too little was passed along to plaintiff. However, as the almost lone survivor, plaintiff must cope.

    6. HFC III act to disseise McCarley ancestral property of 73 years has created emotional distress and Mental Anxiety. The fact that HFC III is convicted for moving Saddam Hussein's money to Cuba, Sudan, and Libya and that they have now illegally disseised a property occupied by a family of US Military Veterans who served in World War's I and II, Korea, Vietnam, Kosovo; plus having a family member to complete missionary duty in Albania, MonteNegro and Kosovo while serving in four war zones, creates an extreme set of emotions that lead to advanced aging, high blood pressure, and other health problems. Then consider those veterans spent 73 years establishing an

irreplaceable cul-de-sac complete with dramatic year-round blooming landscape, a landscape that will take another 73 years to duplicate, and you see the life-span draining emotional distress created by the act of HFC III.

Damage to personal reputation; and,

    7. Today's professional is under greater scrutiny than ever before. McCarley ability to earn key bankruptcy and turnaround contracts requires a personal background review that is perhaps more stringent than a National Security Credential Review. The illegal black mark placed against McCarley by HFC III has effectively ended a McCarley career that was surely bound for selection as CEO or Board member of a major corporation – a fact backed by evidence of such correspondence.

Damage to 30 years of Professional reputation; and,

    8. While a Jury will decide punitive and compensatory damages, they should be instructed that McCarley is a native Alabamian who was bound for a multi-million dollar CEO position with a major corporation. In deliberations, they should be left with the thought that the CEO of HSBC earns around $10 million per year. That McCarley has coached one CEO who earned over $50 million in 2005. The Jury should consider awarding McCarley 7 year's compensation equal to the level of pay of the HSBC CEO and clearly equal to the pay of the Presidents sued in this case.

Damage to 20 years of political aspirations; and,

    9. McCarley began work behind the scenes in Alabama politics about 1988, to include Mayoral campaigns and to include advisement of US Congressional campaigns resulting in his candidate being party nominee. Obviously the stigma of failure associated with a foreclosure immediately ends such activities, just as surely as a jail sentence.

    10. McCarley had also developed a strong political following in Washington, DC via his pro bono lobbyist activities for high profile special causes. Testimony will prove that McCarley led

efforts that resulted in two major changes of direction in the United States Senate. And now, as a direct result of the actions of HFC III, such activity of McCarley has been forced to an end.

Loss of Ancestral Homeplace of 70 years; and,

11.  The property involved has little dollar value due to depressed Real Estate values in Roanoke, Alabama. However, the property has been home to three generations of a proud family of American Soldiers who shed blood to protect Freedom, and includes one missionary who endured 4 war zones. The simple knowledge that a bank that supported Saddam Hussein[22] will now profit from fraud at the expense of three generations of patriots is a heavy load to shoulder. A Jury will have to put a value on this issue.

Prevention of professional job opportunity; and,
Substantial injury leading to elimination of professional income; and,

12.  HFC III illegal act has caused a total stoppage of the otherwise brilliant career of George D. McCarley. An accomplished Bankruptcy and Turnaround Management professional, McCarley has not worked since the illegal default declaration. Understand that such a professional lifestyle requires a liberal credit line in order to negotiate extreme travel expenses. Diners Club actually canceled McCarley charge card upon noting HFC III intent on credit bureau statements.

. Defendants also forwarded negative credit information to the credit reporting agencies at this time. Plaintiff holds proof that a third party actually utilized this negative information against him, as required by citation (document being authenticated) Johnstone v. Bank of America, N.A., N.D.Ill.2001, 173 F.Supp2d 809. Thus the negative credit information was actually used to injure and damage McCarley by preventing his ability to secure professional employment of the type he has enjoyed for 30 years. In fact, McCarley has distributed so many resume's since the illegal act of

---

[22] HSBC was fined $1 million by US Treasury Dept. for their act of moving IRAQ money to Suddan, Cuba, Libya.

false default and subsequent false credit information, that McCarley may never again find professional employment in his chosen or any other field.

> Furthermore, other courts in this district have held that a consumer is not injured by an inaccurate credit report unless that false information **\*817** is communicated to and used by a third party. See, e.g. <u>Renninger,</u> 1998 WL 29547 at **\*6**.

13. Additionally to above, and thanks to the development of the internet, today all employers conduct extensive background checks as a precondition to employment. Such negative informative as presented by the illegal default will quite simply destroy the career of anyone, just as surely as a sentence of capital punishment will destroy a life.

<u>Damage from Slander; and,</u>

14. The illegal act of Slander imparted by the illegal default and foreclosure action has a duplicative ruinous effect on personal life as well as professional. In a small town atmosphere, the whispers are easily heard; "what happened to him, he was doing so well, is it drugs, is it medical, is he retired early, why does he walk all the time, he needs some new clothes, what happened to his family, he'll have to leave here, why does he stay, what happened to his business network, . . . " and the remarks continue although unfounded

<u>Declining Health issues due to economic damages removing money to pay for health care</u>

15. George McCarley is developing a serious set of medical problems as a direct result of HFC III malfeasance. It has been three years since he has been able to afford expensive treatment for a blinding Glaucoma condition. His Gastroesophogul Reflux has gone unchecked for three years. Developing male-related problems need to be treated before it becomes too late. Actuarial tables indicate a personal catastrophe such as foreclosure can reduce lifespan by 3-10 years.

16.. Plaintiff charges that:

(1) Defendant(s) perpetrated false actions by their performance of conditions precedent, disclosure, and other legal actions to include submittal of false legal documents to the courts regarding a material fact, thus, defendant fraudulently disclosed, or, fraudulently stated condition precedent(s) of the mortgage contract; and

(2) Defendant(s) knew or should have known the acts perpetrated were false, thus, defendant knew or should have known the fraudulently disclosed or stated performance of conditions precedent(s) as represented by defendant(s) were false, that defendant(s) status as a national bank indicates defendant(s) were aware of proper legal steps in this process; and

(3) Defendant(s) intended that the falsehood he perpetrated induce the courts and plaintiff to act on it, thus, the defendant(s) made fraudulent disclosure or misrepresented conditions precedent(s) with intent that the courts act based upon defendant(s) misrepresentation; and

(4)Plaintiff suffered damages as a direct result of defendant(s) representation, thus, plaintiff incurred damages as a direct result of the fraudulent disclosure and submittal of legal instruments and of conditions precedent(s) as represented by defendant[23].

17. The Courts review of ALL brief(s) in support will also reveal the defendant(s) had in

effect, a plan to force plaintiff into a state of default.

a) plaintiff constantly talked and complained to defendant account reps by telephone.
b) various account problems were constantly under review, from incorrect billing to improper late fees, to fees for services never rendered,
c) even the illegal default declaration of July 2002 was discussed by telephone and plaintiff believed the situation had been proven false and rectified properly.
d) in fact, the illegal default was never vacated.
e) the ultimate plan of defendant to force[24] default was now in place via the illegal default of July 2002. That instrument served to quash any further professional work opportunities for plaintiff
f) although any and all professional income was destroyed by the illegal default, plaintiff continued to make payments
g) because plaintiff continued to make payments, defendant(s) exercised the final tool of filing illegal legal instruments, as will be proven in court.

18. We charge that there has been such a total defendant(s) failure to disclose even the basic

identity of defendant, along with proof that defendant forced or attempted to force plaintiff

performance failure, along with such total defendant failure to legally record titles, deeds, mortgages,

---

[23] See Miller on FRAUD TREATISE brief in support
[24] See 17 AmJur case citations from Doc 5, page 40, 41 indicating court decisions against this practice.

necessary legal instruments, that no condition of mortgage could possibly exist and this foreclosure is bound to be overturned.

Damages Economic

19. Wherefore plaintiff demands judgment against the defendant(s), and each of them, jointly and severally, as per statutory penalty and damages and costs prescribed by 12 USC §2605 (f), (1),(3),(4), plus those other damages allowed per footnoted citations:

(a) to redress the loss of disseised ancestral property[25], in the amount of twenty-six thousand ($26,000); and

(b) to compensate ongoing property damages[26] in the amount of ten thousand ($10,000); and

(c) to redress five years of lost professional income[27], damages for slander, breach, fraud and RESPA in the amount of five hundred thousand ($500,000); and

(d) to compensate the cost of court costs and related legal and research expenses[28] in the amount of ten thousand ($10,000) per §2605 (f)(3); and

(e) compensation for mental anxiety[29] in the amount of two hundred thousand ($200,000); and

(f) compensation for emotional distress[30] in the amount of two hundred thousand ($200,000); and

---

[25] "In view of the determination that lender violated this subchapter by failing to disclose terms in its statement of disclosure fairly and conspicuously and in meaningful sequence, further proceedings were not necessary with respect to borrowers contention that they were entitled to summary judgment on claim that lender violated this subchapter by failing to disclose . . . " Conrad v. Beneficial Finance Co. of New York Inc., 1977, 394 NYS2d 923.

[26] See footnote to Rawlings plus pecuniary losses as per Katz v. Dime Savings Bank, FSB, W.D.N.Y.1997, 992 F.Supp 250.

[27] Item covered by Actual Damages supported by statute of frauds claims. Also, see all these other citations dealing actual and pecuniary losses. Clearly the illegal act of defendant has eliminated plaintiff ability to earn income.

[28] See Johnstone v. Bank of America. Citation from Cortez v. Keystone Bank, Inc., No. 98-2457, 2000 WL 536666 (E.D.Pa. May 2000) . . . "the court concluded actual damages under RESPA encompass compensation for any pecuniary loss including such things as time spent away from work while preparing correspondence . . .and expenses for preparing, copying, obtaining certifications of instruments . . ." Id at *12 citing Rawlings 64 F.Supp.2d at 1164.

[29] "Term "actual damages" in RESPA provision permitting recovery of " any actual damages to borrower" encompasses "mental anguish" damages" Rawlings v. Dovenmuehle Mort., Inc., M.D.Ala.1999, 64 F.Supp.2d 1156

(g) compensation for advanced and untreated medical conditions[31] by providing a lifetime medical insurance policy in the amount of two hundred thousand ($200,000); and,

(h) statutory penalty damages for defendant(s) violation of 12 USC §2605 in the amount of Fifty Thousand ($50,000); and,

(i) removal of illegal negative credit[32] information in all types and locations, to include removal of bankruptcy filed for no other reason than avoidance of this action; and,

(j) vacating of any and all negative legal paper[33] filed by defendant(s); and,

(k) plaintiff further demand judgment for future damages[34] and slander, breach, fraud and RESPA damages[35] against the defendant(s), and each of them, jointly and severally, in the amount of seven years of minimum level CEO compensation of Seven Million[36] ($7,000,000); and,

(l) that defendant(s) shall pay the full tax burden[37] of any and all awards estimated at Five Hundred Thousand ($500,000)

---

[30] "Borrower could recover actual damages for emotional distress resulting from lender's violations of RESPA" Johnstone v. Bank of America, N.A., N.D.Ill. 2001, 173 F.Supp.2d 809

[31] Covered by Actual Damages provision, along with medical evidence to be produced at trial. Also, see In re Tomasevic, Bkrtcy,M.D.Fla.2002, 273 B.R. 682 (must make common law fraud claim)

[32] See Renninger citation in Johnstone v. Bank of America, . . . "a consumer is not injured by an inaccurate credit report unless that false information *817 is communicated to and used by a third party, See e.g. Renninger, 1998 WL 295497 at *6." McCarley has complained continuously that third parties use of the negative credit information have destroyed his employment opportunity as well as his credit rating.

[33] Id

[34] Future damages qualify as actual damages by nature of defendant complete and total destruction of career of George McCarley. This can be considered both punitive and compensatory as well. In consideration of fact McCarley may never again get in line for CEO position, this is low cost damage control. Typical CEO is Fortune 100 earns $1 million per year minimum, and as high as $10 million.

[35] Id and See Tomasevic. Clearly, common law fraud had been plead and proven.

[36] A similar case of a Corporate President being Slandered by his company and fired, (very similar to the impact of defendant slander on McCarley) went to Federal Arbitration and he was awarded over $3.5 million. On appeal the award was first reduced and on cross appeal fully restored. This is the case of Brown v. Coleman Co. Inc., 2000 10Cir 916, 220 F.#d. 1180 Case Number 99-3181, 99-3203.

[37] Id as well as damages depicted in footnote 11.

**Brown v. Coleman Co., Inc.**
**2000 10CIR 916**
**220 F.3d 1180**
**Case Number: 99-3181, 99-3203**
**Decided: 07/20/2000**
**10th Circuit Court of Appeals**

A three-member arbitration panel awarded Gerald E. Brown a total of $3,617,930 for breach of employment contract, wrongful termination, and defamation by the Coleman Company (Coleman). Brown brought an action under the Federal Arbitration Act to confirm the award. The district court vacated the $2,322,335 portion of the award that was based on the value of certain stock options and confirmed the rest of the award, including $350,001 for defamation. Brown appeals the vacatur of the $2,322,335 award for the stock options, and Coleman appeals the confirmation of the $350,001 award for defamation. We REVERSE in part and AFFIRM in part.

For the foregoing reasons, we reverse the district court's vacatur of the $2,322,335 stock options award, affirm the district court's confirmation of the $350,001 defamation award, and reinstate the panel's award in its entirety.

TITLE 12 > CHAPTER 27 > § 2603Prev | Next

§ 2603. Uniform settlement statement

How Current is This?

(a) The Secretary, in consultation with the Administrator of Veteran's Affairs, the Federal Deposit Insurance Corporation, and the Director of the Office of Thrift Supervision, shall develop and prescribe a standard form for the statement of settlement costs which shall be used (with such variations as may be necessary to reflect differences in legal and administrative requirements or practices in different areas of the country) as the standard real estate settlement form in all transactions in the United States which involve federally related mortgage loans. Such form shall conspicuously and clearly itemize all charges imposed upon the borrower and all charges imposed upon the seller in connection with the settlement and shall indicate whether any title insurance premium included in such charges covers or insures the lender's interest in the property, the borrower's interest, or both. The Secretary may, by regulation, permit the deletion from the form prescribed under this section of items which are not, under local laws or customs, applicable in any locality, except that such regulation shall require that the numerical code prescribed by the Secretary be retained in forms to be used in all localities. Nothing in this section may be construed to require that that part of the standard form which relates to the borrower's transaction be furnished to the seller, or to require that that part of the standard form which relates to the seller be furnished to the borrower.

(b) The form prescribed under this section shall be completed and made available for inspection by the borrower at or before settlement by the person conducting the settlement, except that

(1) the Secretary may exempt from the requirements of this section settlements occurring in localities where the final settlement statement is not customarily provided at or before the date of settlement, or settlements where such requirements are impractical and

(2) the borrower may, in accordance with regulations of the Secretary, waive his right to have the form made available at such time. Upon the request of the borrower to inspect the form prescribed under this section during the business day immediately preceding the day of settlement, the person who will conduct the settlement shall permit the borrower to inspect those items which are known to such person during such preceding day.

TITLE 12 > CHAPTER 27 > § 2609Prev | Next

§ 2609. Limitation on requirement of advance deposits in escrow accounts

How Current is This?

(a) **In general**

A lender, in connection with a federally related mortgage loan, may not require the borrower or prospective borrower—

(1) to deposit in any escrow account which may be established in connection with such loan for the purpose of assuring payment of taxes, insurance premiums, or other charges with respect to the property, in connection with the settlement, an aggregate sum (for

such purpose) in excess of a sum that will be sufficient to pay such taxes, insurance premiums and other charges attributable to the period beginning on the last date on which each such charge would have been paid under the normal lending practice of the lender and local custom, provided that the selection of each such date constitutes prudent lending practice, and ending on the due date of its first full installment payment under the mortgage, plus one-sixth of the estimated total amount of such taxes, insurance premiums and other charges to be paid on dates, as provided above, during the ensuing twelve-month period; or

(2) to deposit in any such escrow account in any month beginning with the first full installment payment under the mortgage a sum (for the purpose of assuring payment of taxes, insurance premiums and other charges with respect to the property) in excess of the sum of

(A) one-twelfth of the total amount of the estimated taxes, insurance premiums and other charges which are reasonably anticipated to be paid on dates during the ensuing twelve months which dates are in accordance with the normal lending practice of the lender and local custom, provided that the selection of each such date constitutes prudent lending practice, plus

(B) such amount as is necessary to maintain an additional balance in such escrow account not to exceed one-sixth of the estimated total amount of such taxes, insurance premiums and other charges to be paid on dates, as provided above, during the ensuing twelve-month period: Provided, however, That in the event the lender determines there will be or is a deficiency he shall not be prohibited from requiring additional monthly deposits in such escrow account to avoid or eliminate such deficiency.

(b) **Notification of shortage in escrow account**

If the terms of any federally related mortgage loan require the borrower to make payments to the servicer (as the term is defined in section 2605 (i) of this title) of the loan for deposit into an escrow account for the purpose of assuring payment of taxes, insurance premiums, and other charges with respect to the property, the servicer shall notify the borrower not less than annually of any shortage of funds in the escrow account.

(c) **Escrow account statements**

(1) **Initial statement**

(A) **In general**

Any servicer that has established an escrow account in connection with a federally related mortgage loan shall submit to the borrower for which the escrow account has been established a statement clearly itemizing the estimated taxes, insurance premiums, and other charges that are reasonably anticipated to be paid from the escrow account during the first 12 months after the establishment of the account and the anticipated dates of such payments.

(B) **Time of submission**

The statement required under subparagraph (A) shall be submitted to the borrower at closing with respect to the property for which the mortgage loan is made or not later than the expiration of the 45-day period beginning on the date of the establishment of the escrow account.

(C) **Initial statement at closing**

Any servicer may submit the statement required under subparagraph (A) to the borrower at closing and may incorporate such statement in the uniform settlement statement

62

required under section 2603 of this title. The Secretary shall issue regulations prescribing any changes necessary to the uniform settlement statement under section 2603 of this title that specify how the statement required under subparagraph (A) of this section shall be incorporated in the uniform settlement statement.

(2) **Annual statement**

(A) **In general**

Any servicer that has established or continued an escrow account in connection with a federally related mortgage loan shall submit to the borrower for which the escrow account has been established or continued a statement clearly itemizing, for each period described in subparagraph (B) (during which the servicer services the escrow account), the amount of the borrower's current monthly payment, the portion of the monthly payment being placed in the escrow account, the total amount paid into the escrow account during the period, the total amount paid out of the escrow account during the period for taxes, insurance premiums, and other charges (as separately identified), and the balance in the escrow account at the conclusion of the period.

(B) **Time of submission**

The statement required under subparagraph (A) shall be submitted to the borrower not less than once for each 12-month period, the first such period beginning on the first January 1st that occurs after November 28, 1990, and shall be submitted not more than 30 days after the conclusion of each such 1-year period.

(d) **Penalties**

(1) **In general**

In the case of each failure to submit a statement to a borrower as required under subsection (c) of this section, the Secretary shall assess to the lender or escrow servicer failing to submit the statement a civil penalty of $50 for each such failure, but the total amount imposed on such lender or escrow servicer for all such failures during any 12-month period referred to in subsection (b) [1] of this section may not exceed $100,000.

(2) **Intentional violations**

If any failure to which paragraph (1) applies is due to intentional disregard of the requirement to submit the statement, then, with respect to such failure—

(A) the penalty imposed under paragraph (1) shall be $100; and

(B) in the case of any penalty determined under subparagraph (A), the $100,000 limitation under paragraph (1) shall not apply.

63