IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

George D. McCarley
    Plaintiff

v.

Household Finance Corporation III
    Defendant

2001 OCT -1 A 9: 13

DEBRA P. HACKETT, CL...
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

Civil Action No. 3:06-CV-0091-MEF
Lead Case[1]

MOTION TO COMPEL DISCOVERY
MOTION FOR SANCTIONS, Pursuant to Fed R. Civ. Pro 8(a, b, c, d, e2) and 11

1. The March 23, 2007 Scheduling Meeting established Deadline for Discovery phase as June 30, 2007. (Doc #43,44,45)  Upon defendant unsatisfactory response to initial interrogatory, Plaintiff petitioned this court for an extension of deadline (Doc #72, 74), and same was granted until July 31, 2007.  As of July 31, plaintiff received no additional responses to interrogatory, then demanded defendant satisfactory by August 31, or else plaintiff would petition the court for relief. (Fed R. Civ. Pro 11(c)(A) calls for 21 day notice prior to submitting curative measures.)

2. The following are plaintiff requests, orders, and defendant's unacceptable response:

FRCP Excerpts: Rule 8, Rule 11 (pages 7 and 8)
Plaintiff Brief(s) in Support[2]:"Disclosure Definition,"(pp9-15) "Fraud at Inception"(pp16-18)
Plaintiff Exhibit 1*:  Initial Interrogatory with Defendant non- response
Plaintiff Exhibit 2:  Official evidence proving Defendant responses are Lies.
    Corporate Registration, South Carolina Secretary of State (Public Database)
Plaintiff Exhibit 3*:  Official evidence proving Defendant responses are Lies
    *Assignment of Security Instrument* recorded by Randolph Probate Judge
Plaintiff Exhibit 4*:  Multi-Format Billing Statements (Defendant Explanation refused)

3. Plaintiff now respectfully requests this court to issue an order compelling defendant to cease his juvenile treatment of this plaintiff and further ordering his compliance with Federal Rules of Civil Procedure in full, open and proper cooperation with Plaintiff discovery requests.

---

[1] 3:06 cv 00091 (lead case) includes Household Finance Corporation, III (00093), HSBC-Gr. Corp. (00102), HSBC Mortgage Services, Inc. (00104), HSBC Finance Corporation (00101), and, Household International, Inc. (00103).
[2] Citing applicable Code of Federal Regulations (CFR)
*Provided by Defendant – see 5 digit Defendant evidence number at bottom right.

4. Plaintiff further moves this court to grant Injunctive Relief to Plaintiff, to compensate the loss of valuable time created by the questionable tactics of the defendant continual unsatisfactory response to interrogatory. Defendant not only causes a time loss to the plaintiff, the defendant response simultaneously demonstrates no respect for this court and no respect for the "rule of law." [3]

5. The Federal Rules of Civil Procedure cited make it clear that a plaintiff is free to suggest more than one option to the court in the manner of sanctions. Plaintiff believes injunctive relief in the amount of $10,000 (ten thousand dollars) is but one option available to the court. (Or any amount deemed proper by this court.) Plaintiff further suggests that defendant has provided yet another set of circumstances from which this plaintiff might be justified in submitting yet another Summary Judgment Motion. The court is clearly free to choose an option that will insure defendant complies with Discovery in a proper manner allowing the continued pursuit of justice in this case.

6. The defendant(s) very tactics in attempting to avoid the free exchange of information on discovery,[4] provide this plaintiff yet continued ammunition that will inflame a jury and lead to a sure and certain plaintiff win at trial. If the defendant were innocent of plaintiff charges, then he should wish to prove his innocence via his response and other evidence in rebuttal of these very questions.

7. To be sure, this defendant has maximum motivation to continue to avoid any response to these type interrogatory. Defendant will surely attempt to block the use of these issues and plaintiff evidence at open trial. That is due to the fact that following a Plaintiff win, this Court will be obliged to recommend a Prosecutor pursue criminal charges against defendant upon the very civil issues raised by the plaintiff interrogatory this defendant attempts to squash via weak response.

EXAMPLES OF DEFENDANT PERFORMANCE FAILURE on interrogatory response

8. Plaintiff believes it necessary to provide the Court a succinct yet sufficiently detailed set of examples of the importance of information to be interchanged by these interrogatory. While there

---

[3] This represents the third instance in which Plaintiff has Demanded Sanctions.

2

are hundreds of options from which plaintiff may explore this evidence at open trial, we will provide

(3) examples and supporting detail from which all these interrogatory may be understood. These and

other points and evidence available for trial will make it clear defendant violated RESPA along with

many corresponding Criminal violations of law.

> a. Defendant *disclosure* failure at inception and throughout mortgage
>    (Brief in Support "Disclosure Definition")
>    (Brief in Support "Fraud at Inception")
>
> b. No *Servicer* relationship may exist without presence of Originator/Creditor
>
> c. Rampant defendant billing violations, thus breach of *conditions precedent*
>    throughout and corresponding breach of RESPA, yet defendant refuses to
>    explain billing statement or the excessive and non-contractual charges billed ,
>    and continues to refuse interrogatory demand to explain same.

8.a.1   The Brief(s) in Support should have the effect of making clear the need for the

disclosure related interrogatory demanded by plaintiff. Plaintiff has made it plain in almost every

filing that he has documented more than 40 different NON-DISCLOSED (thus RESPA breach)

identifies utilized by this defendant. Quite clearly, plaintiff has the right to raise every possible

question to insure the correct defendant and organization is brought to justice. Additionally, the

degree of creditor/defendant disclosure failure at the inception of this mortgage has the full weight

and effect of mooting the mortgage and setting the foreclosure aside altogether.

8.a.2.   The Brief(s) in support make it clear that Congress established very specific Code(s)

of Federal Regulation (CFR) for the specific purpose of insuring full and proper creditor disclosure

to consumers. The Brief(s) also contain case precedent upholding these specific CFR.

---

[4] And on such very obvious points crucial to this case process

8.b.1. A vital "convention" must be spelled out succinctly on the point of and definition for a "*servicer*." A "*servicer*" is a subordinate relationship to a creditor/originator of a loan. The *servicer* is, in effect, a sub-contractor hired by creditor/originator to assist the execution of a specific contract. BLACKS LAW DICTIONARY, 7th Edition provides the following definition for "servicer;"

> *Mortgage Servicing*,  The administration of a mortgage loan, including the collection of payments, release of lien, and payment of property insurance and taxes.  Servicing is usually performed by a lender or the lenders agent for a fee.

Now the court should begin to understand the predicament of our defendant.  Defendant continued to perform as *servicer* <u>with no originator/creditor in evidence</u>.  As McCarley has continually spelled out, the originator/creditor "Homesense Financial" dropped out of sight long ago. Records on file with South Carolina Secretary of State (Plaintiff Exhibit 2) make it clear they merged with another company within days of the McCarley transaction. As the Randolph Probate Judge will testify, Homesense never transferred their title or deed to anyone else.  And now, the defendant has continued to collect money and process legal paper illegally and probably in criminal violation, due to the total absence of a creditor in the McCarley mortgage.

*No Creditor/Originator = No Servicer = No foreclosure*

The defendant was only the servicer and not the originator/creditor.  Only the Originator/Creditor or their successor could legally process a foreclosure.  All the Legal Paper records supplied this court by McCarley makes it clear that the "servicer" (defendant) processed the foreclosure, thus destroying the life and work prospects for McCarley.  Homesense (Originator/Creditor) had long ceased to operate and left no successor.

In response to interrogatory, Defendant alleges they are the "servicer". If the court will refer to PLAINTIFF EXHIBIT 1, page 3, question 4, you will find the defendant statement that is a full LIE, as proven by Plaintiff Exhibit 3, ASSIGNMENT OF SECURITY INSTRUMENT. Defendants interrogatory response indicates that "the loan was made by Homesense Financial and assigned to

4

Household Finance Corporation of Alabama." By contrast, and in stark proof of defendant lie, ASSIGNMENT OF SECURITY INSTRUMENT makes it clear "Homesense" never made any assignment whatsoever. Quite the contrary. "Household" simply claimed the legal paper via a "rubber stamp" and the ineligible "Household" assigned the loan to Mortgage Electronic Registration Systems. Now, perhaps the court will understand that the defendant has been caught in a full and outright lie and that he has every motivation to try and escape this line of questioning.

Quite obviously, they must be ordered to produce full and proper response to interrogatory.

8.c.1. The most simple and succinct point to be argued at this time is the defendant refusal to provide interrogatory response dealing with explanation of billing statements (Plaintiff Exhibit 4) and terms contained, found in questions 23, 24, 25(Plaintiff Exhibit 1). Defendant has in fact provided a copy of 4 different billing statements in use simultaneously by defendant. Obviously any plaintiff would have many questions relevant to the need for 4 different statements and questions relevant to the definition of items contained on the various statements. Plaintiff has complained, beginning with the original complaint, Document #1 and on numerous other occasions that the defendant(s) violated mortgage contract *conditions precedent* on a monthly basis throughout the period of the contract. Obviously, the plaintiff the Court and the Jury has a need to fully understand the billing statements. Obviously, this court must order the defendant to produce full and proper explanation via interrogatory response.

Summation

We promised this court a succinct and concise explanation of the totality of our interrogatory points and we provided three (3) central and major points to be evidenced at trial, and the three points incorporate all the points of interrogatory presented. We demonstrated that the defendant has been caught in an absolute lie on many of his response, and his lies are proven by official documents the defendant has provided. Of more scurrilous note is the fact that a typical corporation as large as the

5

defendant will maintain a database of pre-printed material such as Plaintiff indicated on interrogatory. Such preprinted material has many solid applications at a major corporation, from interdepartmental communication to corporate training to investor and partner correspondence. Therefore, defendant could have supplied these responses within days. Now over 5 months later, plaintiff continues to seek a proper response that is likely in preprinted format. Lastly, plaintiff observes that should the court allow defendant to escape these interrogatory points, this court would in essence be declaring the concept of *disclosure,* as upheld by CFR and other courts to be unconstitutional. We believe it is now incumbent upon this court to order proper defendant production and to strongly consider and award Injunctive Relief as a result of the months of needless time defendant has caused to be expended between the March 23 Scheduling conference and today.

Respectfully submitted

George D. McCarley, Pro Se
216B Chestnut Street
Roanoke, Al 36274
334-863-6489

PROOF OF SERVICE

I, George D. McCarley, do swear or affirm that on September 28, 2007, I have served the enclosed ACTION on each party to the above or that party's counsel, and on every other person required to be served, by depositing envelope containing the above documents in the United States Mail properly addressed, and with first class postage prepaid, for delivery within 3 calendar days.

The Clerk
Middle District of Alabama, Eastern Division
One Church Street, PO Box 711
Montgomery, Al 36101-0711
334-954-3600

Defendant Attorney
Mr. George Parker
Bradley Arant Rose and White
Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, Al 36104
334-956-7671, 956-7700

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 28, 2007

George D. McCarley

Rule 8. General Rules of Pleading

**(a) Claims for Relief.**

A pleading which sets forth a claim for relief, whether an original claim, counterclaim, cross-claim, or third-party claim, shall contain (1) a short and plain statement of the grounds upon which the court's jurisdiction depends, unless the court already has jurisdiction and the claim needs no new grounds of jurisdiction to support it, (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks. Relief in the alternative or of several different types may be demanded.

**(b) Representations to Court.**

By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,--

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

**(c) Sanctions.**

If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation.

**e) Pleading to be Concise and Direct; Consistency**

(1) Each averment of a pleading shall be simple, concise, and direct. No technical forms of pleading or motions are required.

(2) A party may set forth two or more statements of a claim or defense alternately or hypothetically, either in one count or defense or in separate counts or defenses. When two or

more statements are made in the alternative and one of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the alternative statements. A party may also state as many separate claims or defenses as the party has regardless of consistency and whether based on legal, equitable, or maritime grounds. All statements shall be made subject to the obligations set forth in Rule 11.

Rule 11. Signing of Pleadings, Motions, and Other Papers; Representations to Court; Sanctions

**(c) Sanctions.**

If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation.

(1) How Initiated.

(A) By Motion. A motion for sanctions under this rule shall be made separately from other motions or requests and shall describe the specific conduct alleged to violate subdivision (b). It shall be served as provided in Rule 5, but shall not be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected. If warranted, the court may award to the party prevailing on the motion the reasonable expenses and attorney's fees incurred in presenting or opposing the motion. Absent exceptional circumstances, a law firm shall be held jointly responsible for violations committed by its partners, associates, and employees.

Rule 5. Service and Filing of Pleadings and Other Papers

**(a) Service: When Required.**

*DISCLOSURE* DEFINED  (Brief in Support)

"This chapter refers to a transition in Congressional policy from a policy of let-the-buyer-beware to one of let-the-seller-disclose" <u>Allen v. Beneficial Finance</u>, D.C.Ind, 1975, 393 F.Supp.1382, affirmed 531 F.2d 797[5]

1. The process known as DISCLOSURE may be considered the same as the more familiar concept of *<u>contract conditions precedent</u>*.  The balance of this brief should leave no doubt that a creditor that violates *disclosure* has performed an illegal action almost identical to a *Breach of Contract* or a *breach of conditions precedent*.  The legal codes known as RESPA and TILA, with Regulation(s) X and Z, were created almost simultaneously and were heavily authored influenced and amended by the CRANSTON GONZALEZ amendments.  Mr. Cranston of Rhode Island and Mr. Gonzalez of Texas crafted TILA to apply to all credit transactions along with some mortgage transactions and RESPA to apply more specifically to Real Estate transactions.  In practice, many of the operative definitions and legal code are similar.  The single most important element of both codes is found in the word and phrase *DISCLOSURE*.  Infra *<u>Allen</u>* is a case decided against a former subsidiary of defendant Household International.  The citation should make it clear this group of defendant banks has not learned the true definition of *DISCLOSURE* since the 1975 decision above.

Definitions

*<u>Webste</u>r* definition of disclosure:  *DISCLOSE*:  to unclose; to reveal; to divulge; to bring to light.

*<u>Blacks Law Dictionary</u>* definition of disclosure:

> *Disclosure*. n.  The act or process of making something known that was previously unknown; a revelation of facts <a layer's disclosure of a conflict of interest>

2. RESPA definition of *disclosure* is established by the both of Regulation X and Z, along with the 12 USC §2603 UNIFORM SETTLEMENT STATEMENT.  Through the years since passage of TILA and RESPA, this concept of Uniform Settlement Statement was found in several

---

[5] Beneficial Finance is a disgraced and now closed unit of DEFENDANT HOUSEHOLD INTERNATIONAL

statutes and has been called HUD-1, HUD-1a and a Model Disclosure Statement. The Secretary of

HUD is granted responsibility to establish and update the Uniform Settlement Statement.

     3. RESPA establishes authority[6] for the Secretary of Housing and Urban Development to

author and maintain "model disclosure statements." 24 CFR pt. 3500 is the Code of Federal

Regulations that maintains the model disclosure statement along with instructions for same. The

Model Disclosure Statement, presently called Uniform Settlement Statement governs both TILA

and RESPA transactions via further interpretation and rules established in Regulations X and Z.

> From 15 USC §1605,
>
> "If not itemized and disclosed, creditor needs to include that item in the computation
> of finance charge, even if the item is not a charge for credit." Dalton v. Bob Neil
> Pontiac, D.C.N.C. 1979, 476 F.Supp. 789, affirmed 628 F.2d 1348
>
> "it is also a "disclosure law" intended to protect the public from false and fictitious
> charges and to thus avoid the uninformed use of credit"
> White v. Arlen Realty & Dev , C.A.Md 1975, 540 F.2d 645
>
> "This chapter refers to a transition in Congressional policy from a policy of let-the-
> buyer-beware to one of let-the-seller-disclose"
> Allen v. Beneficial Finance, D.C.Ind, 1975, 393 F.Supp.1382, affirmed 531 F.2d 797

Key Citation from notes to US Code 15 USC 1601 *et seq:*

> "Failing to inform consumers about the cost of credit is the evil which this chapter
> was designed to prevent." Ecenrode v. Household Finance Corp. of South Dover,
> D.C.Del.1976, 422 F.Supp. 1327

     4. This demonstrates precisely why statutory penalties for failure to disclose are so high.

This explains why the present Congress is in process of doubling statutory penalty amounts. This is

precisely why the very first line of 15 USC 1638 reads as follows:

**Sec. 1638. - Transactions other than under an open end credit plan**

(a) Required disclosures by creditor

     For each consumer credit transaction other than under an open end credit plan,
the creditor shall disclose each of the following items, to the extent applicable:

---

[6] This authority statute has been moved around several locations and in 1996 was located at 12 USC §§2603, 2617

(1) The identity of the creditor required to make disclosure.

5.  McCarley has charged and will continue to charge that HSBC and the group of (5) defendants have never been in compliance with terms of the contract and therefore, no condition of default or foreclosure can possibly be deemed just.  Citation from US Code for 15 USC 1638 (TILA)

> "In view of the determination that lender violated this subchapter by failing to disclose terms in its statement of disclosure fairly and conspicuously and in meaningful sequence, further proceedings were not necessary with respect to borrowers contention that they were entitled to summary judgment on claim that lender violated this subchapter by failing to disclose . . . "   Conrad v. Beneficial Finance Co. of New York Inc., 1977, 394 NYS2d 923.

6.  The intent of Congress is further upheld by the Courts as evidenced by the following opinions found in US Code notes upholding 15 USC 1640.

> "Congress sought in this section to vest considerable enforcement power in **"private attorneys general,"** individual borrowers who by suing lenders for alleged violations could achieve widespread compliance without government intervention."   Bizier v. Globe Financial Services, Inc., C.A.Mass 1981, 654 F.2d 1.

> "Provision of this section that any creditor who fails in connection with any consumer credit transaction to disclose required information shall be liable . . ."   Kelly v. Beneficial Finance Co. of Alabama, Ala.CivApp. 1979, 374 So2d 338, writ denied 374 So2d 340

> "Construction is to be liberally construed in favor of borrowers."   Allen v. Beneficial Finance Co., D.C.Ind, 1975, 393 F.Supp.1382, affirmed 531 F.2d 797

Notes to the §1601 entitled PURPOSE GENERALLY provide the following applicable citations:

> "This chapter is designed to prevent unscrupulous and predatory creditor practices"   Littlefield v. Walt Flanagan & Co., C.A. Colo 1974, 498 F.2d 1133.


DUTY TO DISCLOSE EVEN THE SMALLEST DETAILS
(Taken from Prof. Gene Marsh treatise: A Practitioners Guide to the New Alabama Mini-Code)

> *Gene A. Marsh* [* Professor of Law, The University of Alabama School of Law and Member, 1996 Governor's Task Force on the Mini-Code. J.D., 1981, Washington and Lee University; B.S., 1978, M.S., 1978, Ohio State University. I am grateful to The University of Alabama Law School Foundation and the Bruce Strother Memorial Research Fund for research support. I would also like to thank attorneys

Hank Hutchinson and Holt Speir who worked with me on a Mini-Code continuing education seminar for the Community Bankers Association of Alabama. Thanks also to law students Kirby Williams and Joel Connally for their help with this Article.]

III. The 1971 Enactment

Shortly after the 1971 enactment of the Mini-Code, practitioners and commentators described the statute as marked by "deficiencies, ambiguities and inconsistencies. "[Galloway, supra note 11, at 448.] Neither the passage of time nor a number of amendments prior to 1996 made the law easier to understand for those using the Mini-Code offensively, defensively, or in structuring their consumer installment sales contracts or loan documents. Although for many years the Mini-Code lay largely dormant, several major cases decided in the 1990s caused consumer credit to be at the forefront of the debate over reform of the civil laws in Alabama. Although several of those cases will be reviewed below, probably no case in Alabama has had a greater impact on the consumer credit industry than *Smith v. First Family Financial Services* [ 626 So. 2d 1266 (Ala. 1993).] which launched numerous lawsuits and resulted in an immediate amendment to the Mini-Code, as well as provided some of the momentum which led to the 1996 Mini-Code revisions. This case deserves special treatment among the major Mini-Code cases of the 1990s because its effect is still being felt, even after enactment of the revised Mini-Code.

B. The Surprise Duty to Disclose

In *Smith*, the Alabama Supreme Court surprised the financial community by providing an avenue for a fraudulent suppression claim, even where all disclosure requirements under the Mini-Code and TILA were thought to have been satisfied. [See Smith , 626 So. 2d at 1272-73.] In *Smith*, the court reversed and remanded the trial court's entry of summary judgment for the defendants in an action challenging the "yield spread premium" in a table funded loan. [See id. at 1269. In a "table funded" loan, the mort gage broker completes all of the originating functions usually in the name of the mortgage broker. See id. The mort gage broker closes the loan but relies on the advance of funds sup plied by the mortgage lender, which of ten occurs simultaneously with the loan closing. See id . Once the loan is closed, the mort gage broker immediately assigns the mort gage to the lender. See id. Although the mort gage broker is identified as the creditor and may be the only entity dealing with the borrower, the assignee-lender is the source of the funds. See id]

A yield spread premium is generated when a "loan" is written by a broker (or car dealer finance and insurance office) at a higher interest rate than the assignee requires. [See generally David B. McCrae, Yield Spread Premiums and Discounts in Sub-Prime Auto Financing, The Conference on Consumer Finance Law, Sub-Prime Mortgage Lending and Auto Finance (Feb. 8-9, 1996) (on file with author).] The broker (or car dealer) retains all or a portion of the difference as an "origination fee" or as compensation for handling the transaction before the paper is assigned to the mortgage lender, bank, or finance company. The yield spread premium is often calculated by taking the present value of the rate spread and is either paid directly by the assignee back to the originator or entered in a "reserve" out of which payments

are periodically paid to the loan originator or car dealer. In the event there is a recourse arrangement between the loan originator (dealer) and assignee, the reserve may be tapped by the assignee in cases where the consumer loans do not pay out.

Critical to an understanding of the hoopla surrounding *Smith* and the other yield spread cases is that *the annual percentage rate (APR) on the loan was accurately disclosed to the borrower*. [See Smith, 626 So. 2d at 1269. The annual percentage rate (APR) is the actuarially correct yearly interest rate expressed as a percentage. The term is de fined at 15 U.S.C. § 1606(a) (1994).] It is also fair to say that based on the facts of *Smith* and the relevant Mini-Code section which imposes a five-point cap on origination fees, the *Smith* result was not fantastic. [ See Smith , 626 So. 2d at 1268-71; see also Ala. Code § 5-19-4(g) (1996) which pro vides: (g) A creditor may, pursuant to a consumer credit transaction contract se cured by an interest in real property, charge and collect points in an amount not to exceed five percent of the original principal balance in the case of a closed-end consumer credit transaction, or five percent of the total line of credit in the case of an open-end credit plan. Points may be paid in cash at the time of the consumer credit transaction, or may be deducted from the proceeds and included in the original amount financed for the purposes of Section 5-19-3 or financed under the open-end ed credit plan. Points shall be in addition to all other charges, are fully earned on the date of the consumer credit transaction, and may be excluded from the finance charge for the purpose of computing any finance charge credit or re fund.] Indeed, the loan broker in *Smith* evidently did receive a total compensation that exceeded the five-point limit, and as the Alabama Supreme Court noted, the federal Real Estate Settlement Procedures Act of 1974 now requires disclosure of the loan broker's fee in most table funded arrangements. [See Smith , 626 So. 2d at 1272. The Real Estate Settlement Procedures Act of 1974 is found at 12 U.S.C. §§ 2601-2617 (1994). Regulation X, 24 C.F.R. pt. 3500, which implements The Real Estate Settlement Procedures Act, details a number of mortgage broker disclosure requirements. See Kathleen E. Keest, The Cost of Credit § 11.3.1 (1995).] But rather than focus on the particulars of *Smith* as they relate to real estate lending and disclosure of loan brokers fees in real estate loans, it is more important to focus on language in the opinion that generated a number of lawsuits and the damage control undertaken by the Alabama Legislature by way of a Mini-Code amendment.

In *Smith*, the court declared that the Mini-Code requires full disclosure of all finance charges, whether direct or indirect, and by whatever designation. [See Smith, 626 So. 2d at 1271.] The court found a failing of First Family or EquiSouth (the loan broker) to disclose the compensation the broker was receiving through the yield spread premium. [See id. at 1271-72.] The court noted that such payments to the loan broker "are part of the total finance charges borne by the borrower under the Mini-Code, and, as such, are required to be disclosed to the borrower under Alabama law." [Id. at 1272.] The analysis in the case is driven by whether the plaintiff produced sufficient evidence to support the contentions and thereby create a genuine issue of material fact (making summary judgment improper). [See id. at 1272-73.] However, it was the language in *Smith* holding a "duty to disclose under the Mini-Code" which became the linchpin in subsequent lawsuits. [See id. at 1272.]

The "duty" component of *Smith* allowed plaintiffs to satisfy what had been a missing element in the attempt to use a fraudulent suppression claim in consumer credit cases. To establish a prima facie case of suppression of a material fact under section 6-5-102 of the Code of Alabama, a plaintiff must show (1) that the defendant had a *duty* to disclose a material fact, (2) that the defendant concealed or failed to disclose this material fact, (3) that the defendant's concealment or failure to disclose this material fact induced the plaintiff to act or to refrain from acting, and (4) that the plaintiff suffered actual damage as a proximate result. [See <u>Hines v. Riverside Chevrolet-Olds, Inc.</u>, 655 So. 2d 909, 918 (Ala. 1994); <u>Dodd v. Nelda Stephenson Chevro let, Inc.</u>, 626 So. 2d 1288, 1293 (Ala. 1993); <u>Soniat v. John son-Rast & Hays</u>, 626 So. 2d 1256, 1258 (Ala. 1993); <u>Bak er v. Bennet</u>, 603 So. 2d 928, 934-35 (Ala. 1992).] Although attempts to create a duty to disclose in a lender-borrower relationship had been tried through other routes (fiduciary relationship, inequality in bargaining power, etc.), these attempts were largely unsuccessful. The reading of *Smith* that was most commonly applied by the plaintiff's bar provided instant access to a fraud theory, but by way of a failure to disclose under the Mini-Code.

8. Alabama legislature has continued to amend the Mini-Code so as to make the code more applicable to today's creditor and debtor requirements. Each amendment broadens the definition and application of the process of disclosure, as exemplified by the following cases cited by Marsh.

### C. The 1994 Mini-Code Amendments

The questions of whether the 1994 amendment to the Alabama Mini-Code resolved the "duty to disclose" issue has recently been answered, but not in the creditor's favor. In ***Bramlett v. Adamson Ford***, [ No. 2950526, 1996 WL 730853 (Ala. Civ. App., Dec. 20, 1996).] the Alabama Court of Civil Appeals reversed a summary judgment that had been granted in favor of a car dealer and assignee in a yield spread premium case. [See Bramlett , No. 2950526, 1996 WL 730853, at *4.] The court noted that although the 1994 amendment to section 5-19-6 established that there was no duty to disclose yield spread financing under the Mini-Code, section 5-19-6 "does not mean that a duty to disclose such a discount cannot arise from other circumstances."[Id . at *3.] The plaintiff in *Bramlett* alleged that he had asked the agent of the car dealer why the interest rate was so high and was told that the rate was high because he was a "poor credit risk." [See id. at *2.] The Alabama Court of Civil Appeals reasoned that under such circumstances where the consumer inquires as to the rate, the trier of fact could infer that the car dealer had a duty to disclose the full nature of the commission to be earned by a sharing of the interest rate, which in this case resulted in a three percent commission for the car dealer. [See id. at *3.] Thus, the theory of *Bramlett* offers another end-around a Mini-Code amendment that was carefully written to head off yield spread litigation based on a duty to disclose under the Mini-Code. The *Bramlett* decision has been described as a "bombshell" by the Alabama Automobile Dealers Association. [ See Phillip Rawls, Salesmen Must Tell All Truth, Court Says , Birmingham News , Jan. 12, 1997, at D1.]

## CONTRACT CONDITIONS PRECEDENT VERSUS DISCLOSURE

9.    Another primary example leading to a more complete understanding of the term *disclosure* and Congressional intent for application of *disclosure* is to compare the concept of *disclosure* to the older *common law* concept of *conditions precedent*. Simply stated, under common law, the conditions of the contract were expected to be explained and fully delineated within the contract. Any failure of either party to the contract to fully adhere and abide by those *conditions precedent* could be considered grounds for *breach of contract*. Likewise, a creditor's failure to *disclose* or abide by any condition *disclosed*, is grounds for penalty under both TILA, RESPA, ALABAMA MINI-CODE

10.    The most elementary summation of the definition and expectation of the legislature in drafting RESPA is that all possible factors that will affect consumer decisions is expected to be fully and fairly *disclosed*, as may be found in the following case citation:

> "This chapter refers to a transition in Congressional policy from a policy of let-the-buyer-beware to one of let-the-seller-disclose"
> Allen v. Beneficial Finance, D.C.Ind, 1975, 393 F.Supp.1382, affirmed 531 F.2d 797

Of fourteen (14) cases cited in this *Disclosure* brief, please note that five were assessed against business units of the defendant HOUSEHOLD INTERNATIONAL. It is clear they have not learned their lesson as intended by Congress and state legislatures.

Disclosure Fraud at Inception of Mortgage    (Brief in Support)
Fraud in Legal Paper Throughout Mortgage

1.  Mortgage was originated by Mortgage broker d.b.a. Homesense Financial Services (Homesense), having Vestavia Hills address. They immediately sold McCarley mortgage to Household Financial Services and six months later had ceased all business activity. Homesense appeared to be a credible organization – were properly registered with the Alabama Secretary of State and the Alabama State Banking Authority.

2. It was not until plaintiff investigation following foreclosure that we learned of the "fly by night" nature of this organization. We invoke by reference exhibits 26, 27, 28 on Doc. # 19 as the first step in identifying the legal problems created by Homesense. The appendix also includes a recital of the 12 CFR Regulation X and Z requirements of law that exist for the creditor to notify the debtor of any changes in status of the creditor and Homesense fully fails all those statutes found in 12 CFR §§ 226.5, 226.9, 226.17.

3.  Plaintiff charges that:

(1) Homesense made a false statement(s) regarding a material fact, thus, defendant fraudulently or failed to disclose, or, fraudulently ignored the requirement to report changing conditions or other condition precedent(s) of the mortgage contract; and

(2) Homesense knew or should have known the representation was false, thus, defendant knew or should have known the fraudulently disclosed or ignored conditions precedent(s) as represented by defendant(s) were false as a direct result of their having filed a proper CHANGE OF SERVICER disclosure; and

(3) Homesense intended that the representation induce plaintiff to act on it, thus, the defendant(s) made fraudulent disclosure or ignored conditions precedent(s) with intent that plaintiff act based upon defendant(s) misrepresentation; and

(4)Plaintiff suffered damages in justifiable reliance on the representation, thus, plaintiff incurred damages in justifiable reliance on the fraudulent disclosure of conditions precedent(s) as represented by defendant.

3.  Homesense then makes matters far worse by dropping out of sight in some sort of continual merger of companies documented by the South Carolina Secretary of State.

4. Homesense created an immediate RESPA disclosure violation by

a) failing to notify debtor of changing conditions of the mergers as required by Regulation Z.
b) registering a deed, mortgage, and title in the false name of a nonexistent corporation.
c) initiating the fraudulent ASSIGNMENT OF SECURITY INSTRUMENT (now officially authenticated for evidence purposes and submitted with this package) on the very same day the mortgage is initiated.
d) ASSIGNMENT OF SECURITY INSTRUMENT was signed and notarized by what appears to be the requisite people on the very day of initiation of mortgage, which leads to the inescapable conclusion that plaintiff was targeted for foreclosure on the very day of mortgage initiation.
e) Instrument above was not registered by Randolph County Probate Judge for more than two years beyond the date it was signed and notarized.
f) Plaintiff was not notified of the existence of the document above.
g) Homesense never recorded the fact they had sold the mortgage to any other organization.
h) Homesense remained the "owner of record in Randolph County Probate Office.
i) Homesense never recorded the fact they had sold the right to McCarley mortgage
j) Defendant(s) became servicer and took McCarley payments for 30 months, all of which time, the registered owner was defunct and out of business.
k) Plaintiff must learn to whom servicer forwarded proceeds of McCarley payments
l) It appears a point of fraud that defendant(s) would continue to take McCarley money while there was no officially recorded owner of the mortgage, title, or property

5. Household Financial Services (HFS), a predecessor of defendant(s) became the disclosed servicer of the mortgage in June 2000 and never recorded their presence in the Randolph County Probate Office, although once claiming to be owner of mortgage, Doc #19, ex 54, page 2.

m) HFS converted to Household Finance Corporation (HFC) during the mortgage.
n) HFC declared themselves "in control" on the ASSIGNMENT OF SECURITY INSTRUMENT, via their act of naming Mortgage Electronic Registration Systems the assignee.
o) HFC never officially or properly recorded any legal paper whatsoever throughout this mortgage tenure, as is clearly required by 12 CFR Regulation Z. and also by RESPA.

6. This total failure to legally disclose, as required by statutes identified herein, along with the total failure to properly and legally record the necessary legal documents with the Randolph County Judge of Probate, should make clear that no binding conditions of mortgage ever existed, and that the subsequent mortgage foreclosure is due to be overturned.

7. Every point outlined herein is a violation of the disclosure process demanded by RESPA, and penalty provisions are due to be enacted to the redress of McCarley injuries.

8. Best example of the intent of Congress as regards this fortiori of disclosure failure is:

17

12 CFR 226.9  Subsequent disclosure requirements

> Whenever any term required to be disclosed under 12 CFR 226.6 is changed or the required minimum periodic payment is increased, the creditor shall mail or deliver written notice of the change to each consumer who may be affected. The notice must be mailed at least 15 days prior to the charge.

Note 3   Identification of Creditor

> Where no approximation nor any explanation of absence of lenders identity from disclosure statements provided to borrower by mortgage loan broker was even attempted, . . . did not excuse brokers failure to make all required disclosures. Pedro v. Pacific Plan of California, D.C.Cal. 1975, F.Supp. 315.

> Disclosure of each creditor involved in loan transaction was to be made together with all the disclosures required by pre-simplification Regulation Z, on the same side of a single page of statement. Id.

These opinions seem to uphold McCarley allegations of fraud in disclo